## No. 13,116.

THE STATE OF LOUISIANA VS. THE NEW ORLEANS DEBENTURE REDEMP-
TION COMPANY OF LOUISIANA, LIMITED.

### SYLLABUS.

51 1827
51 1819
51 1820
51 1822
51 1824
51 1826
51 1827
112 8

1. ALLEGATIONS NOT INCONSISTENT.—The State may allege that a corporation has no valid existence and yet have a standing in court to prove that it should be enjoined and prohibited from continuing the business in which it is engaged.

2. THE SHARES ISSUED.—The Constitution contains the provision, that no corporation shall issue stock nor bonds, except for labor done or money or property actually received.

The charter of the defendant company reads, "No stock shall be issued or certificate given therefor, until the amount subscribed for shall be fully paid."

The article of the Constitution and the clause of the charter were not complied with, and for that reason the organization was not perfected as required.

Where a corporation is organized under a general statute, the organizers must observe the mode required by the statute.

3. SALE OF DEBENTURES.—Looking only to the interest on one-fourth of the debentures upon which the company rests its hope to pay its remaining indebtedness, this interest is not enough to pay all of the remaining indebted-

State vs. New Orleans Debenture Co., Ltd.

ness of the corporation. Failure on that theory is inevitable. When the State seeks to enjoin a corporation, the latter must be prepared to defend and show that its business does not expose the public, with whom it deals, to inevitable loss.

a. LAPSES AND SURRENDERS.—The large amount required to meet the deficit, after having credited the interest on the one-fourth, cannot be acquired by a plan wherein the rights of a number of the debenture holders are declared off, owing to their inability to keep up their contracts. In that case, the element of chance would predominate, and a certainty of loss arise which the laws authorizing the organization of corporations do not sustain. A franchise imports a restriction greater than those imposed upon business not carried on in the name of a corporation.

b. NOT AN ESTOPPEL.—The statute regarding licenses cannot be pleaded as an estoppel if the business is not conducted in accordance with the policy of the State.

ON APPEAL from the Civil District Court for the Parish of Orleans, Monroe, J.

M. J. Cunningham, Attorney General, (F. B. Rainold and Stifft and Madison, of counsel), for the State of Louisiana and August M. Benedict, Liquidator, Plaintiffs and Appellees.

J. F. Pierson and W. H. Rogers for the Defendant and Appellant.

Argued and submitted May 18, 1899.
Opinion handed down June 22, 1899.
Judgment modified June 29, 1899.
Judgment amended and rehearing refused June 30, 1899.
The opinion of the court was delivered by BREAUX, J.

On the application for rehearing by Nicholls, C. J.

Pending in the Supreme Court of the United States by virtue of a writ of error.

BREAUX, J. This action was brought by the State of Louisiana through the Attorney General against the New Orleans Debenture Company, its officers, stock holders and members to set aside the charter of defendant company, liquidate its affairs and enjoin defendant's operations as a debenture company.

Plaintiff's grounds are:

That the company is not legally organized; that it carries on no

State vs. New Orleans Debenture Co., Ltd.

business; that it is a debenture company with little capital, formed to sell its debentures or borrow money on its debentures; that the company obligates itself to pay 50 per cent upon the amount paid by the subscribers, at times set forth in the charter; that it assumes to declare lapsed or forfeited, its own debentures; that upon the basis organized, it must fail; that the franchise the company claims is exercised without proper sanction.

Plaintiff alleges that the defendant issued shares to the amount of fifty thousand dollars, on which the subscribers paid only 5 per cent; that the subscribers or their assigns gave their promissory notes to the company for 95 per cent of their subscriptions, and the company then loaned to the subscribers or their assigns the amount of their promissory notes from the reserve fund of the company—the reserve fund being part of the moneys derived from the debentures; that thereupon the subscribers or their assigns gave money paid to them from the reserve fund back to the company, and shares of stock were issued to them as fully paid.

## EXCEPTION.

The defendant interposed a peremptory exception to the plaintiff's action, averring that the proper parties are not before the court; that plaintiff's petition discloses no cause of action, and that the action is inconsistent.

The judge of the District Court overruled the exception, holding, in substance: The right to be a corporation cannot be exercised without the sanction of the legislature, and the State can bring about a judicial inquiry; if it be shown that the franchise is being exercised without grant, then the State can put an end to the exercise; and, in the second place that, as relates to proper parties, the District Court decided that the defendant cannot question the authority of the agent named in its charter to represent the company in all its suits. The suit is brought against the president, who is authorized to represent the defendants in the present action; that the State has naught to do with debenture holders, and there is no necessity to make them parties; that the action was against the defendant to ascertain whether the defendant company was using its franchise without authority; that plaintiff's petition sets out a cause of action and is not contradictory.

## ANSWER.

The exception having been overruled, the defendant filed an answer in which it denied that it issued capital stock as alleged by the plaintiff. It denied all of plaintiff's allegations, save those specially admitted.

The defendant, in its answer, alleged specially that it is a duly organized corporation under Statute 36 of 1888, and that its incorporation dates from September 24th, 1894; that it was organized for the purposes declared in its charter; that the subscribers paid for their shares; that its debenture holders did not complain; on the contrary, they ask that the terms of their contract with the company be carried out as agreed upon.

Defendant specially denies the charge set forth by plaintiff, that this contract is only a transaction or wager. It denies that it has entered into a contract, dealing or transaction embracing any element of chance not included in any ordinary contract or transaction.

This closes our review of the pleadings.

The evidence discloses the following facts:

The company was organized on the day it alleges that it was organized. One hundred thousand dollars was the amount of the stock to be issued as provided in the charter, divided into one thousand shares of one hundred dollars each, payable in installments as the Board of Directors determined. Fifty per cent of the capital stock was the amount fixed with which to commence business, and no stock was to be issued before the amount of the *subscription had been paid.* (Italics ours.) The first call on the subscribers for their subscription was made in September, 1894. It was left optional to pay 10 per cent cash or 5 per cent on a demand note; $2560 was paid in cash, and the balance was paid in notes, which was subsequently paid by crediting the borrowers with dividends.

Subsequently, by resolution, the loans were made to the shareholders of the reserve fund of "an amount not exceeding 90 per cent of the face value of the stock held by him upon the borrower executing a pledge note, payable on demand, bearing interest at the rate of 6 per cent *per annum,* payable every ninety days and secured by the borrower's stock." The following is a copy of one of the resolutions

adopted by the Board of Directors: "The president is hereby authorized and instructed to loan from the reserve fund to any stockholder an amount not exceeding ninety per cent of the face value of the stock held by him upon his executing a pledge note, payable on demand, bearing interest at the rate of six per cent *per annum*, payable every ninety days, to which must be attached as collateral security for the payment of said note the said stock held by him, together with the full power of attorney of any transfer or assignment thereof, it being a part of the obligation that all dividends declared on said stock, to be payable to the redemption of the interest and principal due on said note."

The object in passing this resolution was to assist some of the shareholders in complying with the requirement of the company.

In other words, the subscriber was permitted to borrow 85 per cent of the face value of the stock from the company. The resolution authorized the loan of 90 per cent, but it appears that the real percentage was eighty-five, because there had been a dividend of 5 per cent declared from the earnings of the expense fund, and the subscribers were not given an opportunity of borrowing on shares paid up.

There were twenty-eight stockholders holding five hundred shares. Of that number twenty-one, holding four hundred and twenty shares of the entire stock, availed themselves of the privilege of borrowing from the company. Stockholders who did not borrow, paid up their subscriptions in full; that is, $6800.

Now, with reference to the purpose of the company. It announced in its charter that its purpose was to provide for the investment of small sums of money by the issue of debentures, payable at fixed dates, with profit, and thus of assisting investors in becoming owners of houses and other property.

The following appears to have been its method of business:

The debentures were issued substitutes on conditions of the payment of two dollars in advance, and of the monthly payment of two dollars on or before the first of each month until the payment of seventy-two installments (amounting in all to one hundred and forty-four dollars). It was further stipulated on the face of the debentures that if its holder failed to pay on or be-

-fore the fifth of each month, his policy lapsed, and prior payments were forfeited and inured to the company.

In another clause of the charter provision was made entitling the holder of a debenture, if he paid seven months' instalments, to receive a return of 50 per cent of the monthly installment paid, if for any reason he chose to close with the company and discontinue his investment.

The debentures were to be numbered and redeemed in numerical order from month to month.

The following was the manner of distributing the amount received from the debenture holders:

Sixty-five per cent went into a fund known as the debenture fund, which was used for the redemption of debentures each month; 25 per cent of the amount was placed in the reserve fund for investment. In addition, the company had a revenue from the lapses and forfeitures, and from fines and fees, for reinstating the holders of debentures who had not paid up in accordance with the charter.

The District Court decreed that the charter was a nullity; that the president, secretary, general manager and other officers and members of the company were without legal authority, and made the injunction sued for peremptory.

From this judgment, the defendants appealed.

1st.   The defendant, by way of exception, in the first place, charges that plaintiff's petition contains contradictory allegations; that it alleges that the company exists and immediately after, in the petition, it denies that it has any legal existence.

We are not impressed by this plea of inconsistency.   Defendant's position is not sustained by the terms of the petition, nor by the prayer whereby plaintiff seeks to enjoin defendant from acting as a corporation and from doing any business under its charter; and in the alternative, plaintiff asks that *if* it should be held that the organization of the company was authorized, then, for stated reasons in the petition, that its charter be forfeited.

There was no contrary demand.   The exception to dismiss, on the ground that the demands were contradictory, was overruled by the lower court.   We have not discovered error in the ruling.   Schmitt vs. Drouet and Rabasse, 42 Ann., 716.

Plaintiff having alleged that defendant was operating under an in-

valid charter, defendant insists that because of its averment, it cannot be brought into court as a representative of an incorporated body.

The State of Louisiana brought this suit, as we read the petition, to enjoin defendant from operating under a plan which the State avers is not consonant with public policy.

We take it the State has a *locus standi* in court to urge that the president, secretary and other officers of the company should not continue in certain operations, and that upon proper showing the State may obtain a judgment to perpetually enjoin these defendants in whatever capacity or under whatever charter it may be operating. If these defendants are operating without a corporate character, the greater is the right of the State to an injunction.

"The attorney general is authorized to bring a suit when any one unlawfully exercises a franchise, or when an association shall act as a corporation without being duly incorporated; and he is also authorized to obtain a forfeiture of charters in cases of violations, where no provision has been made by law for the forfeiture of the charters; and lastly, he is authorized to institute all suits he may deem necessary for the protection of the interests and rights of the State."

Statute 65 of 1884.

The defendant also objects to the suit on the ground that the proper parties are not before the court, and contends that the action should have been brought against the stockholders personally.

The stockholders, under the terms of their charter, delegated to the officers named as defendants here, the power to represent the corporation, in so far as they were concerned.

These officers were acting under the color of right. This, under the statute, we think, is enough to hold them bound to stand in defense of the suit brought.

Provision for citing associations or numbers of persons acting within the State as a corporation, is inserted in the statutes. R. S. 2503; 2595.

Moreover, the usurpation of a corporation franchise—if there was usurpation—is a matter between the State and the company; and the State is entitled to an injunction against defendant to restrain it from doing business—if there is cause.

A citation lies against the body.

A corporation is defined as a legal person with a special name and composed of such members and endowed with such powers, and such only, as the law prescribes.

Now, contradictorily with its president, the State can prove that it is not entitled to a special name; that it is not composed of the members it claims, and that it is not endowed with such powers as the law prescribes, or that it has forfeited and lost its right to carry on business or to transact at all.

The averment of nullity of the charter by plaintiff is not as broad and far reaching as defendant contends. It is an alternative averment, no good reason suggests itself why the president should not answer a petition charging that its charter is a nullity.

There is here no question of personal responsibility of the stockholders, and therefore no necessity arises for citing them. If we are in error in this, sustaining defendant's ground would not go to the dismissal of the suit. The only judgment that could be rendered would be a judgment remanding the case to the lower court, in order that all the stockholders might be made parties to the suit.

2nd. We pass to the first ground of attack on the part of the State, to-wit: That the shareholders did not comply with the law in giving notes for the amount of their subscription.

The charter contains this provision: "No stock shall be issued nor certificate given therefor, until the amount subscribed for shall have been paid."

In its circular the company announced that the capital *paid up* on its stock was *fifty thousand dollars.* We have noted that the shareholders did not pay all their shares, but issued their notes for an amount. (Italics ours.)

Mr. Thompson, in his commentaries on the Law of Corporations, Sec. 1219, says, that a promise to pay (for the shares for which the promissor subscribes), evidenced by note, is not a payment, nor a sufficient compliance with the statute which *requires payment in cash* in accordance with the terms of the charter. Here the charter *required payment in cash.*

We have not found that the decision cited by appellant, has application here. 12 Pac. Rep., 49, Trust vs. Dorsey.

In the first place, the action in the cited case was based on a

promissory note; and the contention of the maker of the note was, that the contract, in execution of which the note was given, was against public policy and prohibited by law, and so the note was void. In fine, the maker sought to escape from paying his own note, by pleading that his own act was against public policy.

In the second place, Mr. Thompson clearly differences the class of cases in which the charter does not contain provision for paying *shares cash,* and those in which it is declared in the charter that the stock *must be paid cash.*

When a corporation sets forth in its charter that all certificates of stock have been issued and cash received therefor, and notifies the public that it is operating upon paid up stock to the amount of fifty thousand dollars, the note of the shareholder is not paid up capital, which those dealing with the company have a right to expect, under the plain terms of the articles of the constitution cited.

"Giving a promissory note for the sum which a charter requires to be paid in money, is not a compliance with law. If such notes were to be taken as money, the policy of the law which requires a payment of money, might be easily defeated," said the Supreme Court of Pennsylvania, in a similar case. Leightly vs. Company, 14 Sarg. 435.

In Boyd vs. Peach Botton R. Co., 90 Pa. S. T., 169, the court *inter alia* said, "The language is plain and emphatic, and the manifest object of the requirement was to protect the public against fictitious corporations, with capital stock subscribed perhaps by irresponsible persons, and not a dollar thereof paid or intended to be paid.

"Giving a note for the amount was not payment within the meaning of the law."

We quote from Thompson on "Corporations," Sec. 1219: "It was held that for the railroad company to take as cash the notes of individuals made for the occasion to enable the officers to make the certificate, under a promise that such notes were not to be enforced, was immoral and 'against public policy.'"

We have naught to do with the harsh language; we only quote it because it, in our view, sustains a principle.

In the case before us the subscription had been declared paid. This was announced both to the government and the public. It had *not been paid.* The loan was *not payment* within the intendment of the act. The delivery of shares as collateral security did not add

seriousness to the act. The security of the company consisted in the amount of cash it published as having been paid, and of the certificate of shares in the hands of stockholders, and not of shares deposited in lieu of capital due.

3rd. Defendant, through counsel, filed elaborate briefs on other points. We do not think the company has been legally organized, and we might have stopped after reaching that conclusion.

But other points having been pressed upon us, we gave them our careful attention.

In defendant's brief it is stated that no definite period is fixed by the charter for the maturity of the debentures. The original charter fixed the period of the maturity of the debentures at six years from the date of its issue. The company has always since issued debentures to be redeemed in six years. In 1897, by an amendment of the charter, the time for payment of debentures was not fixed, and defendant insists that for that reason the period fixed in the original charter has been repealed.

Granted for the moment that the time for redeeming the debentures is not limited to six years; many years, on defendant's theory, would have to elapse before it would be possible to meet the company's indebtedness.

To illustrate, let us suppose that one purchases a debenture for one hundred dollars. Of this, sixty-five dollars are used in liquidating other debentures, maturing at a prior date. On this amount, (to-wit, $65), observe, that the buyer must lose all interest. He is not to be benefited.

Twenty-five dollars is held in reserve.

It is classified as the "reserve fund."

Ten dollars are used to meet the expenses of the company. It would be a marvelous state of affairs if the twenty-five dollars, reserve fund, were to yield enough in less time than many, many years to meet the promises of the company.

Defendant argues: if this reserve fund can be re-invested annually at 6 per cent, that in course of years it will be greater in amount than the par value of the outstanding debentures of the company.

We take the illustration suggested by the defendant in the brief and assume, that one pays one dollar to the company in order to receive from it one dollar and fifty cents in return. The company takes ten cents for expenses; twenty-five cents becomes part of the reserve

fund.; and it takes sixty-five cents to redeem debentures of a prior date. The company, it is contended, is indebted in the sum of eighty-five cents. To pay this, it has twenty-five cents and the interest it produces. Six per cent, compound interest, on twenty-five cents would produce sixty cents in fifteen years, (with capital, making eighty-five cents).

This assumes, that during these many years investors will present themselves and buy debentures with the hope that in fifteen years the amount of profit promised will be paid. If investors do not present themselves after a few years, then the twenty-five cents would have to produce one dollar and twenty-five cents, (that is, if we include, as unpaid, the sixty-five cents, known as the redemption item) and that would take, in time, more than twice the number of years before stated. The plan considered from that point of view is entirely out of the question. It is not feasible.

We have taken up this line only to follow one of the arguments of the brief. But we are confident that it was never the intention to carry on the business on the fifteen or twenty-one year plan.

Everything indicates that six years was the time fixed by all parties. concerned, and that no one contemplated a longer time than six years to meet all the indebtedness of the company. It will take only a moment to determine that this (*i. e.,* on a limit of six years) is less feasible than the plan we have just considered, (*i. e.,* the 15 or 21 years plan).

The evidence informs us that the amount paid by the debenture holder is two dollars a month, until the sum of one hundred and forty-four dollars is paid; that is, on payment of seventy-two monthly installments of two dollars each.

The defendant has the use of the whole amount only for three years and not for six years, as the amount is received monthly in seventy-two installments.

Compound interest at six per cent (a rate of interest suggested by defendant) would amount on $144, to $27.50. A comparatively small amount with which to pay 50 per cent profit, besides the capital paid by the debenture buyer to the company.

It is evident that interest on the 25 per cent of monthly installments falls far short of the company's indebtedness to the debenture holder. A time must come in the six years when the debenture holder

will be a loser. From this standpoint, success is an absolute impossibility.

The company has another source of revenue—the "lapses and surrenders." They are as follows: It appears that the debenture holder who neglects or is unwilling to pay the monthly installment prior to the expiration of seven month after his purchase, loses the whole amount paid in; but those who fail to pay after the expiration of the seven months are entitled to a return of fifty per cent. on the amount they paid to the company. This is the surrender value of the debenture.

Counsel for defendant states that it is error to assert or to assume that the system of debentures is based upon "lapses and surrenders;" that, on the contrary, all calculation is based upon the power of working out the theoretical soundness of the system, without regard to "lapses and surrenders."

The secretary of the company, who is, the record informs us, an actuary (or has given the subject considerable attention), as a witness, is not, as we take it, in accord with the foregoing views.

He was asked in the District Court by the learned judge presiding, while testifying, "to assume that a given number of debenture holders stood by their contract and paid all installments on their debentures, would the company, from the money thus paid in by the debenture holders, be able to redeem the debentures and pay 50 per cent profit to the investors upon the maturity of the debentures at the end of six years?"

His answer was, *"No."*

His opinion was, that by carrying the calculation on any given number of debentures to twenty-one years, that all the debentures would be paid from the interest on the 25 per cent reserve fund, and this without taking into account the "lapses;" but without the "lapses" it was not possible to pay the debentures at the end of six years.

He fixed the rates of lapses and surrenders needful to pay the debentures, at the end of six years, at eighteen per cent *per annum.* At that rate, we think lapses and surrenders would not be a mere incident, but they would become a principal object with the corporation, which we are informed, by counsel, never was the intention.

If the chances of loss were as great as 18 per cent, the venture would trench on chance and would be against laws enacted to prohibit

aleatory operations. An absolute loss of 18 per cent (that is, 18 per cent annually, for three years equal to 54 per cent, would be too large an amount to be considered legal or reasonable.

Some reference was made by defendant's counsel to the life insurance plan, and more particularly, to the mutual and tontine plan.

In our view any plan of insurance, resting for its existence upon so great a loss as that just indicated, would have the appearance of chance operation and would scarcely be fair to all the policy holders.

An account is somewhere given of a company in Europe, organized some years ago, on the Tontine plan. It operated on extravagant estimate of mortality of the subscribers. In a short time, it was proven that the company, in order to carry out its promises, would have, at the expiration of three years, to remain with only twelve survivors, on one hundred policy holders, an impossibility, it was found, unless in the event of a considerable epidemic. That company had to close its doors.

But to return to the plan of the defendant company, here. It proposes to redeem the debentures issued in numerical order after six months from the date of first issue of debentures. At the end of six years the company positively promises to pay. The first debentures issued, it is evident, will be paid; but afterward, unless the company is favored with an ever increasing number of debenture buyers—"new blood,"—the holders of debentures will surely meet with loss. They will receive nothing. All calculations based on payment in six years, show that loss is inevitable, unless "lapses and forfeitures" are to be considered as factors of revenue to an extent for which the defendant itself does not contend.

The evidence discloses that the debenture company has in force about 11,000 debentures.

A calculation showing a liquidation, with a lapse of 18 per cent (and no new business), shows "lapses and surrenders" as being 5,913.

This is an impossibility upon its face. If it be not impossible, such losses, that is, a loss growing out of "lapses" of 5970 debentures out of 11,000 debentures, brought on by any enterprise, is not in accordance with public policy.

This, however, is not the position of the defendant company. It places reliance on the "interest account" exclusively, which, we have

State vs. New Orleans Debenture Co., Ltd.

found, does not produce enough to meet the liability of the company, but much less.

The defendant company has been favored with business. It has had a large number of buyers of its debentures, and yet in the fifth year of its existence it is evident that its assets are much less than its liability.

We think that the management was good enough; none the less it has fallen behind; all, we believe, because the plan is not feasible.

Defendant insists that it is. If there is lurking somewhere in the plan of this corporation, something that may, in the end, prove beneficial to the shareholders, officers or customers, or something that may prove favorable to the policy of the State, we are unable to find it.

The defendant further insists that the business of a debenture redemption company, specified in Statute 171 of 1898, is not an illegal business, for the reason that it is expressly recognized by the revenue statute, as among the trades, professions and callings in this State.

We think it answer enough to hold that the courts have jurisdiction to consider and pass upon questions growing out of the business of corporations, when the issues are of such a character as presented in the case before us. If the object and purposes are not feasible, or if they are not in accordance with the policy of the State, the fact that a license has been issued to a corporation cannot operate as an estoppel to the extent that its illegal operations may not be inquired into. The purpose must be in accordance with the laws of the State; if it be not consistent with the laws, no license can operate as a bar to a judgment decreeing the illegality.

We have carefully examined the tabulated statements of the company, the actuary's computations and the different proportions, none pointing, as we think, to a safe and satisfactory result, when six years is taken as a limit of operations. The fact is, that there is in all the operations of the company, no reproduction, no sufficient adding, on a safe basis, to the assets.

Some one has truly said, "Nature perpetuates itself by reproduction"—an example it would be well never to forget.

For the reasons assigned, the judgment appealed from is affirmed.

JUDGMENT.

In this case, judgment was rendered in the District Court in favor of plaintiff, dated March 2nd, 1899. Signed, March 8th, 1899.

From this judgment defendant applied for, and obtained, a suspensive appeal.

On appeal, this court affirmed the judgment of the District Court.

Subsequent to the date of this judgment, on motion of the Attorney General, the District Court recognized the appointment, and commission of the Governor of the State of Louisiana, issued to August. M. Benedict, and ordered that a commission issue to him as liquidator.
From this order, a separate appeal was taken by a number of the shareholders.

The law and the evidence being in favor of the plaintiff, it is ordered, adjudged and decreed that the order issued by the court, recognizing August M. Benedict as liquidator, be annulled, avoided and reversed, and the matter left at large.

It is further ordered, adjudged and decreed that all the rights of the parties are reserved—as relates to the appointment of receiver or liquidator—to be hereafter passed upon, and that this decree is rendered without prejudice in matter of deciding the questions presented in case 13,114; New Orleans Debenture Redemption Company vs. Judge.

Having decided the case in the lower court, Mr. Justice Monroe takes no part in the case here.

### ON APPLICATION FOR REHEARING.

NICHOLLS, C. J.   In this case, on the 22nd of June, 1899, as relates to the appointment of a receiver or liquidator, a decree of the court was handed down, which, in part, read as follows, viz.:

"That the said judgment, in so far as it appoints a receiver or liquidator, be reversed, reserving to the State of Louisiana and all other parties in interest, all rights under the law relative to the appointment of a receiver or liquidator."

The attorney general and associate counsel have filed an application for a rehearing and so have counsel for defendant.

The State avers that the public interest, and particularly, the interest of the debenture holders demands a settlement of the question, as relates to the appointment of a receiver or of a liquidator; and the State asks that the liquidator, appointed by the governor, be recognized.

These cases were argued late in the session.   The argument was

directed to the question of the legality *vel non* of the charter under which the respective companies carried on business.

The illegality of the charter was decreed. The court considered that, as to liquidator or receiver *vel non,* contradictorily with parties in interest, the question can be considered in the District Court to which the judgment is remanded for execution.

The whole question, as to the appointment of liquidator or receiver, was left at large and to be considered as an original question. Whether the appointment of liquidator lies with the governor, or of receiver with the court, or the parties in interest, we do not determine. It is left as an open question.

Rehearing refused.