FRANK B. COLEMAN, Trustee of Estate of GEORGE D. ALLEN PAPER COMPANY, a Bankrupt, v. LOUIS F. BOOTH et al., Executors of Estate of CHARLES D. GARNETT, Appellants.

**Division One, June 2, 1916.**

1. **CORPORATION: Assets: Good Will: Fraud.** The good will of a corporation which has been honest in the conduct of its business is property and a valuable asset; but good will which is fictitious and has no actuality, and has been brought into existence by deceit and fraud is not legal. Where two individuals merged their separate businesses, organized a corporation with a capital of $50,000, put in $20,000 in property as part payment, and carried $30,000 by way of good will, as a credit instead of debit, and designated it on the books as undivided surplus, which was never replaced by either money or

property; and later, organized a new company with a nominal capital of $250,000, and in order to make a good showing and to induce others to buy its stock carried into the new company, in payment of its capital stock, the capital of the old, as of the value of $50,000, and the properties of a subsidiary company, owned by them, of the value of $81,981.86, and the remainder of $118,018.14 as good will or undivided surplus, thereby making a total false credit of $148,018.14, the padding of the capital stock with this fictitious credit was an unvarnished fraud upon the public, and those directors who participated in it by borrowing money from the company to pay for stock, first sold to others by the company at its face value as fully paid up, and later bought back by them, are liable, as are their estates, to the trustee in bankruptcy of the insolvent corporation.

2. ——: ——: ——: **Dividend: Unjustified.** A corporation is not justified in declaring a dividend of twenty-five per cent when more than one-half of its capital stock is good will (much of it fictitious) and carried on its books as undivided surplus, and, excluding good will, otherwise impaired to an amount in excess of one-fourth.

3. ——: ——: ——: **In the Form of Notes.** And when said dividend is put in the form of notes, which, with full knowledge by the payee of the false credit given the company by the fictitious good will carried as assets and undivided surplus, are afterwards paid, the payee, or his estate, is liable to the corporation, or its trustee in bankruptcy, for the amount thereof.

4. ——: ——: ——: **Suit By Trustee In Bankruptcy.** The extensive powers given to a trustee in bankruptcy are for the purpose of enabling him to uncover the fraudulent acts of a corporation whose padding of its capital stock has enabled it to obtain a fictitious credit; and, in such case, he can maintain a suit to recover dividends fraudulently paid to participating directors, whether the debts allowed against the bankrupt corporation were in existence when the fraudulent acts were done or subsequently made.

5. ——: **Right of Creditors.** A creditor of a corporation has the right to assume that its capital stock is paid up, when the company so advertises; and in dealing with and giving credit to it, he is authorized to assume that its capital stock is intact, and has not been impaired by unauthorized or fraudulent dividends or a fictitious capitalization.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher*, Judge.

AFFIRMED.

*George W. Lubke* and *George W. Lubke, Jr.*, for appellants.

(1) Good-will is recognized as a species of property which may have great value. As such it has been held to be taxable by the State. State ex rel. v. Jones, 51 Ohio St. 492; Express Co. v. Ohio State Auditor, 165 U. S. 194; People ex rel. v. Roberts, 154 N. Y. 101; Beebe v. Hatfield, 67 Mo. App. 609; White v. Jones, 79 App. Div. (N. Y.) 373; Washburn v. Wall Paper Co., 81 Fed. 17. (2) Even though a corporation may not have a cash surplus, if it has accumulated property in excess of its capital, such excess may be treated as a surplus for the purpose of declaring dividends. Roberts v. Robert Wicks Co., 184 N. Y. 257. Net profits for the purpose of dividends are the difference between the present value of all corporate assets and the sum of all liabilities and the capital stock. Russell v. Bristol, 49 Conn. 251; Phillips v. Railroad, 138 Mass. 122. Even though no actual profits have been earned in a given year, a dividend may nevertheless be declared out of a surplus accumulated out of the profits of previous years. Beers v. Spring Co., 42 Conn. 17; Williams v. Tel. Co., 92 N. Y. 102. Whether a dividend may be properly declared must be determined by the condition of the corporation at the time the dividend is ordered. Thompson on Corporations (2 Ed.), sec. 5309; Reid v. Mfg. Co., 40 Ga. 103. When a dividend has been declared, the right of the stockholders thereto becomes vested and cannot be changed without their consent. McLaran v. Planing Mill Co., 117 Mo. App. 40. Nor can the insolvency of the corporation arising after the dividend has been declared defeat the right of the stock holders to take it from the corporation as

against creditors. Le Roy v. Ins. Co., 2 Edw. Ch. (N. Y.) 657; In re Le Blanc, 14 Hun (N. Y.), 8. (3) But even if there was no surplus and a dividend had been declared and paid which impaired the capital, under the statute there is a liability on the part of the directors participating in the action only for such debts as existed at the time or were thereafter contracted while they were in office. There was no evidence in this case that any of the debts now owed by the bankrupt existed on June 9, 1909, and no allegation to that effect appeared in the petition. R. S. 1909, sec. 3348; Shields v. Hobart, 172 Mo. 491.

*Grant & Grant* and *Leahy, Saunders & Barth* for respondent.

(1) A trustee in bankruptcy is the successor to all the rights of creditors under the State law. Remington on Bankruptcy (2 Ed.), secs. 1207-8. (2) The facts in this case, as found both by the referee and lower court, shows that the scheme devised was a fraud upon creditors of the company because: (a) The money of the corporation was used to pay the individual debt of one of its officers, with the knowledge of the creditor receiving it, a former director, vice-president, secretary and chief stockholder, who had arranged to have it done, and then resigned, selling his stock at the same time. (b) The fictitious dividend declared rendered the company insolvent. (c) This fictitious dividend diminished the capital stock of the company, which was never paid in full, and the creditor receiving such dividend, the vice-president in active charge, secretary, and chief stockholder of the company, when the scheme was devised, had reason to know both that the company would become insolvent and that its capital stock would be diminished by the payment of such dividend to him. (d) The said creditor also knew that the company had been steadily losing money and he was very anxious to

sever his connection with the company provided he could devise some scheme, which he did, to get par for his stock, to be paid from the company's assets. (3) It is the settled law in this State and elsewhere that it is unlawful for an officer or employee to use the funds of a corporation to pay his individual debt, also that if the creditors, receiving the funds, have knowledge, actual or imputed, that the funds used belong to the corporation, they may be recovered back from such creditor. Bank v. Investment Co., 160 Mo. App. 379; Bank v. Edwards, 243 Mo. 567. (4) As was said in the case of Chrisman-Sawyer Banking Company v. Mfg. Co., 168 Mo. 634, when a corporation is sent forth into the commercial world, accredited by them, the stockholders, as possessed of a capital stock in money or its equivalent in property, equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid, and that the money, or its equivalent in property, will be forthcoming in response to his legitimate demand. See, also, Meyer v. Mining Co., 192 Mo. 189, and Boley v. Development Co., 126 Mo. App. 119. Our claim is: First, that dividends cannot be declared when, in order to create a surplus out of which to pay the dividends, good will must be considered in estimating the assets of the corporation. Secondly, that the good will of George D. Allen Paper Company, even if it could be considered in estimating the assets, was of practically no value. Dividends can lawfully be paid only out of profits actually earned. Any dividend which would diminish the amount of the capital stock of the corporation is expressly prohibited by our statute. R. S. 1909, sec. 3348; Railroad v. State of Tennessee, 153 U. S. 486. (5) The term "profits" denotes what remains after defraying every expense, including loans falling due as well as the interest on such loans.

Corry v. Londonberry & E. R. Co., 29 Beav. 263; St. John v. Railroad, 10 Blatch. 279; Miller v. Brodish, 69 Iowa, 278; Hubbard v. Weaver, 79 La. 678; Thompson on Corporations, sec. 5305. (6) "An officer, or director of a corporation, becomes a trustee for the benefit of all parties interested, when he obtains property of the corporation in a manner inconsistent with his duty to the corporation." Broussard v. Mason, 187 Mo. App. 292.

RAILEY, C.—This action was begun in the circuit court of St. Louis City, on September 15, 1911, by respondent, Frank B. Coleman, as trustee in bankruptcy of the estate of the George D. Allen Paper Company, to recover against appellants, as executor and executrix of the estate of Charles D. Garnett, deceased, the sum of $80,487.

It is admitted that Coleman was appointed trustee in bankruptcy of said estate, and that the defendants were duly appointed as executor and executrix of the estate of Charles D. Garnett, deceased.

It appears from the record that Charles D. Garnett and George D. Allen were separately engaged in the paper business in St. Louis, Missouri. They concluded to join their interests, and in 1897 they organized under the laws of this State as a corporation by the name of The Garnett & Allen Paper Company, with a capital stock of $50,000. Twenty thousand dollars of property belonging to Garnett and Allen was put in as part of said capital stock, and the remaining $30,000 was carried as *good will*, and designated on the books of said company as "undivided surplus." No part of this $30,000 was ever checked off or replaced with either money or property.

In 1905, in order to induce one Grubb to buy stock in said company, Garnett and Allen conceived the idea of increasing the capital stock to $250,000. They had an auxiliary paper company—which really

belonged to the Garnett & Allen Paper Company—which had made large profits from 1897 to said date, and this property was sold and from the proceeds thereof, Garnett and Allen realized in the neighborhood of $81,000 in money and property. The capital stock of $250,000 was made up of the $50,000 heretofore mentioned, and by the addition thereto of the $81,000 realized from the sale of the paper company property. The remaining $118,018.14 was carried upon the books of the company as *good will* and designated thereon as "undivided surplus." There were 2500 shares of this stock divided between Garnett, Allen and others. Each share was of the denomination of one hundred dollars. Garnett owned 1110 shares; Booth, 233 shares; Dana, 50 shares; Cavanaugh, 50 shares; Collins, 5 shares; Dwyer, 2 shares, and Allen 1050 shares.

It does not appear that anything was paid upon said stock when the capital was raised to $250,000 aside from that heretofore mentioned. It does not appear that any part of the $118,018.14, carried as *good will,* or "undivided surplus," was ever replaced by money or property at any time. The company, when the capital stock was increased to $250,000, was then known as the Garnett, Allen & Grubb Paper Company. Grubb remained a member of said firm but a short time, and sold his stock to Garnett, Allen and Booth. Garnett and Booth borrowed from the above company $15,673 with which to pay Grubb for their share of the stock purchased, and executed to the paper company their joint note for said sum. Allen likewise borrowed from the paper company the money with which to pay for his share of the stock purchased from Grubb, and he executed to the paper company his note therefor.

The evidence tends to show that from 1897 to 1908 large profits were made by these companies, said to aggregate in the neighborhood of $375,000.

It is claimed that out of this sum there was paid about $141,000 of dividends, leaving a balance of $234,000 of property, good will, etc., belonging to the Garnett & Allen Paper Company, which had succeeded the former company of Garnett, Allen & Grubb. The profits during the years 1908 and 1909 had fallen off and were gradually growing less, until those for the year 1909 were less than $6000. The productive plant known as "The Columbia Paper Company," which produced such large revenues during the years heretofore mentioned, had been sold before the capital stock was raised to $250,000.

During the early part of the year 1909 some disagreements had arisen between Garnett and Allen in regard to the conduct of the company's business, Garnett purchased the stock of Booth, and this gave him the controlling interest in said corporation. Booth, however, remained as a director until the first of January, 1910. Finally, Allen concluded to purchase the 1343 shares of stock then owned by Garnett, and accordingly, on the 8th of June, 1909, a meeting was had of the board of directors of said Garnett & Allen Paper Company, for the purpose of carrying out the agreement made between Garnett and Allen, in regard to the purchase of Garnett's stock. At this meeting, a resolution was offered and carried, to the effect that $125,000 should be carried upon the books of said company as *good will,* and the same was entered in accordance with said resolution. Another resolution was offered and carried at the same time, to the effect that a dividend of twenty-five per cent, or $62,500, should be declared; and in order to fulfill the contract of purchase between Garnett and Allen, it was provided at said meeting that the $62,500 should be represented by non-negotiable notes of said paper company without interest, and that these notes, when so executed, should be delivered to Garnett as collateral security for the payment of the $134,300

due him from George D. Allen, for the 1343 shares of stock purchased by Allen from Garnett. As a part of this agreement between Garnett and Allen, the latter, after getting control of Garnett's stock, agreed to turn over to Garnett the $15,673 note executed by Garnett and Booth to the paper company aforesaid.

The evidence tends to show that when this meeting was held, on the 8th of June, 1909, the paper company then owed $30,000 to one of the banks, besides that which was due for current expenses. It also appears that, with the $30,000 carried as *good will* in 1897 and the $30,000 owed to the bank, the paper company, at the time of said meeting, had only $174,-000 of property and assets, including the $118,018.14 of good will heretofore mentioned.

The referee found, and the evidence tends to show, that Garnett was fully cognizant of all the facts aforesaid, and had full knowledge of everything that was going on during all of these transactions. The evidence likewise tends to show, and the referee found, that Garnett ultimately received from the Garnett & Allen Paper Company, including the $15,673 note, $80,487 belonging to the Garnett & Allen Paper Company.

It is insisted by appellant, that on account of the matters aforesaid, he is entitled to recover from defendants, as executor and executrix of Garnett's estate, the above sum of $80,487, on account of the dissipation of the company's capital stock aforesaid, etc.

Appellants in the court below filed exceptions to the report of the referee, which were overruled, and judgment entered in favor of respondent for the amount aforesaid, which was ordered certified to the probate court of the city of St. Louis for allowance against the estate of said Charles D. Garnett. Appellants filed motion for a new trial within the time

authorized by law, which was overruled and the cause duly appealed to this court.

I. On June 8, 1909, Charles D. Garnett, George D. Allen and Louis F. Booth were the directors of the Garnett & Allen Paper Company, a Missouri corporation, and held a directors' meeting in St.

Good Will of Corporation. Louis, Missouri, on the date aforesaid.

At said meeting they undertook to increase the assets of said company, by the adoption of the following resolution:

"Whereas, the good will of the Garnett & Allen Paper Company is a valuable asset, which, in the judgment of the board of directors, is of the fair market value of $125,000, and has not heretofore been entered upon the books as an asset of said company: Now, therefore, be it resolved that the good will of the company shall be carried upon the books as an asset in the amount of $125,000 and be credited to the surplus account."

It is insisted by appellants that the action of said board in thus attempting to increase the assets of said company, is valid; and that the conclusion reached by the referee and trial court in respect to this matter is erroneous.

In order to determine the legality of said proceeding, it will be necessary to consider certain facts in regard to the previous history of said company. In 1897, Charles D. Garnett and George D. Allen were separately engaged in the paper business, and concluded to unite their interests. They accordingly organized a Missouri corporation in May, 1897, and called it the Garnett & Allen Paper Company. Its capital stock was named at $50,000, but they put in about $20,000 in property as part payment of said capital stock, and carried the $30,000 by way of good will, as a credit instead of debit. It does not appear from the record, that said $30,000 designated as "un-

divided surplus," was ever replaced by either money or property, at any time, before the above meeting of June 8, 1909, or at any other time.

In 1905, in order to make a good showing, for the purpose of inducing Mr. Grubb to take stock in the company, Garnett and Allen concluded to increase the capital stock to $250,000. They already had the $50,000 capital stock arranged as above indicated, by the use of $20,000 worth of personal property and $30,000 of good will, or undivided surplus. The remaining $200,000 of capital was paid, by turning over money and property of the Columbia Paper Company, which really belonged to the Garnett & Allen Paper Company, of the estimated value of $81,981.86; and the remaining $118,018.14 was carried as good will, or undivided surplus, and placed as a credit, instead of debit.

We have not been able to find any place in the record indicating that the above good will or undivided surplus, was ever, at any time, replaced by money or property belonging to said company.

After this progressive raise in the capital stock to $250,000, Garnett and Allen sold Grubb some stock and changed the name of the corporation to Garnett, Allen & Grubb Paper Company. Grubb remained in the firm but a short time, and sold his stock to Garnett, Allen and Booth for $30,000. Garnett and Booth borrowed from the company $15,673 to pay Grubb for their share of the stock bought from him, and executed their note to the company for the amount thus borrowed. Allen likewise borrowed from the company the money to pay for his share of the stock bought from Grubb, and executed his note to the company therefor. The name of the corporation was then changed to the Garnett & Allen Paper Company.

Even if it be conceded that good will, in a proper case, may be considered in estimating the value of a plant and its assets, yet the act of Garnett and Allen,

in attempting to cover up the deficit of $30,000 of unpaid capital stock in 1897, when they first organized the Garnett & Allen Paper Company, by carrying it as good will, or undivided surplus, and as a credit instead of a deficit, was a plain, unvarnished fraud upon the public, and exhibited an utter disregard of the obligations which they owed the State and community in which they were proposing to do business. They had just commenced operations together. They had not at that time established a reputation or business which, under the authorities cited by appellants, entitled them to have taxed up as a part of their assets, the good will of the corporation. It should not be forgotten in passing, that Charles D. Garnett was one of the prime movers in establishing this method of false bookkeeping, by the use of good will as an asset, in order to cover up the deficiency in their original capital stock of $50,000.

Defendant Booth, in respect to this matter, testified:

"Mr. Allen had contracts to furnish different publications and they put them in as part of the assets which we estimated at about $20,000, and the rest of it was called good will, which, by the way, was never put on the books, however.

"Q. That was $30,000 that they put in for good will? A. Yes, sir."

We are justified, from the evidence before us, in holding that Garnett, before he retired from the Garnett & Allen Paper Company as a director and stockholder on June 8, 1909, was fully aware of the fact that this $30,000 of pure "wind" was still carried as a part of the capital stock of said company, and that it had never been replaced with either property or money, although the corporation had earned extensive profits up to April, 1898, when they began to fall off, and continued to grow less, until April, 1909, when the profits were only $5963.58.

Turning to the alleged increase of the capital stock in 1905 from $50000 to $250,000, we find from the testimony of Booth, who had the journal of the company before him, how it was transacted. He testified as follows:

"Q. Now, will you turn to the journal, page 197? A. Yes, sir, I have it here (Indicating).

"Q. And read the statment as you find it there with reference to the Columbia Paper Stock Company's business under date of September 30, 1905? A. 'September 30, 1905, Sundries, to Capital Stock, Paper Stock Department. Sundries, Capital Stock, $200,000 Paper Stock Department, $81,981.86. Book Value Columbia Paper Stock Company business, September 30, 1905, merged into the G. A. & G. Paper Company.'

"Q. And the next two words? A. 'Undivided Surplus, $118,018.14.'

"Q. And what do those entries mean? A. Why, it was made to put my books in shape so that it would show a capital stock of $250,000.

"Q. Well, what does that item, 'Book value of the Columbia Paper Stock business, $118,018.14,' mean? A. That is not a part of it; that was the charge against the undivided surplus account; as I said before, that undivided surplus account was a flexible account that we charged or credited to, to make trial balances come out every time right.

"Q. In other words, then, there was an increase there of $200,000 capital stock? A. Yes, sir.

"Q. Part of that was paid up by the Paper Stock Department to the extent of $81,981.86? A. Yes, sir.

"Q. And then that left a deficit in capital stock to the extent of $118,018.14, which had to be paid up in some other manner? A. Yes, but the surplus account on the Garnett & Allen books was a credit."

This was the second time Mr. Garnett attempted, in the conduct of his company's business, to deceive

the public, by giving the latter to understand that the capital stock of said company for $250,000 was fully paid up, when he well knew that $30,000 of false credit was entered in 1897, and $118.018.14 in 1905, making a total false credit as to said capital stock, of $148,018.14, and only $101,981.86 of money and property put in to make up the entire capital stock of $250,000.

When the 8th of June, 1909, arrived, the Garnett & Allen Paper Company was still carrying said $148,-018.14 as part of its capital stock. Garnett knew at that time that this fictitious credit was still being used to pad the capital stock, and that as a matter of fact only $101,981.86 in money and property had actually been set apart as a portion of said capital stock. Mr. Garnett and his co-directors having participated in this progressive and reckless species of "high finance," were in no position to have the assets of their company still increased to the extent of $125,000 by way of good will, based upon the reputation which they had established in behalf of their company.

Counsel for appellants in their brief, in discussing this question, say:

"A well reasoned Federal case speaks of goodwill thus:

" 'There is nothing marvelous or mysterious about it. When an individual or a firm or a corporation has gone on for an unbroken series of years conducting a particular business, and has been so scrupulous in fulfilling every obligation, so careful in maintaining the standard of the goods dealt in, so absolutely honest and fair in all business dealings that customers of the concern have become convinced that their experience in the future will be as satisfactory as it has been in the past, while such customers' good report of their own experience tends continually to bring new customers to the same concern, there has

been produced an element of value quite as important —in some cases, perhaps, far more important—than the plant or machinery with which the business is carried on. That it is property is abundantly settled by authority, and, indeed, is not disputed. That in some cases it may be very valuable property is manifest. The individual who has created it by years of hard work and fair business dealing usually experiences, no difficulty in finding men willing to pay him for it, if he be willing to sell it to them. Legislation devised to restrict the accumulation of the fruits of industry may impair its value by denying to its producer the right to enter into a contract enforceable at law not to interfere with its enjoyment by the purchaser, but, so long as any belief in human honesty remains, there will be found some persons willing to buy such property, the very existence of which implies honest business dealing in the past. And so long as it remains salable it is valuable.' [Washburn v. National Wall Paper Co., 81 Fed. 17.]''

The above opinion, like all others which uphold the right to consider as assets the good will of a corporation, is based upon the idea that it has been honest in the conduct of its business. No court of justice would recognize as legal, good will, brought about through either fraud or deceit. A corporation, or an individual, might through dishonesty and false dealing, build up a lucrative and paying business, but the good will of same would not be recognized as of any legal value, when challenged in a court of justice. The hypothetical questions propounded to Forrester and Woodson in respect to the value of good will as an asset, did not comprehend the dealings of Garnett and others heretofore criticised, and especially the fact that good will had already been twice entered and carried as a credit. Hence their testimony is of little practical value in passing upon the merits of the controversy before us.

Upon a thorough consideration of the above ques-
tion, we have reached the conclusion that the action
of the board of directors of the Garnett & Allen Paper
Company, on June 8, 1909, in attempting to increase
the value of the assets of said company by adding
thereto $125,000 for good will, was. without authority
of law and void.

II.   It is insisted by appellants that the directors
of the Garnett. & Allen Paper Company on June 8,
1909, were justified, in view of the financial condition
of said company, in declaring a dividend
of twenty-five per cent. or $62,500, payable
out of the alleged surplus of said company.

Dividend.

The facts disclosed in the record do not sustain
the above contention.   On the other hand, we cannot
escape the conclusion that Garnett and the other direc-
tors, when they were undertaking to declare this div-
idend, knew that there was no surplus of said company
out of which to pay the same, and likewise knew that
the company did not then have sufficient assets of any
kind or description to make good the capital stock of
$250,000.   Even conceding that the directors, when
they increased the capital stock to $250,000 in 1905,
had reason to believe that the extensive business
theretofore done would warrant the carrying of the
$118.018.14 as good will, still there was absolutely
no excuse for their undertaking to carry as good will
the $30,000.00 used for that purpose in 1897, when
the company first commenced doing business, and
when it had established no reputation which entitled
it to. any such asset.

Taking then, the undisputed facts, which were
known to the directors on the 8th of June aforesaid,
we find from the testimony of Booth that there was
.on hand at that time, according to the books of the
company, that which is designated assets, amounting
to $234,000.   It does not appear that the $148,000
theretofore carried as good will had ever been checked

off or replaced by either money or property, but on the contrary it had been carried as a credit of the company to that extent. The $30,000 therefore allowed as good will in 1897 could not be sustained even from the viewpoint of Garnett and others, for the reason heretofore stated. If then this sum had been deducted from the $234,000, it would only have left $204,000 of good, bad and indifferent assets and property, as well as good will, on hand on the 8th day of June aforesaid.

It is conceded that on said date, and prior thereto, the company owed the Mechanics-American Bank $30,000, besides the current expenses due for carrying on the ordinary business. This $30,000 due the bank, taken from the $204,000 supra, leaves only $174,-000 belonging to said company, of property, assets, good will and everything combined on hand at the time of the meeting of said board on the above date. Said sum of $174,000, if taken from the capital stock of $250,000, left the company with $76,000 of property, good will, etc. less than the capital stock.

We are at a loss to know how Garnett and others could have figured out that the company was entitled to a third application of good will when they had already taxed up two others, as a part of their business. Even if it be conceded that they were equitably entitled to the $118,018.14 used as good will when the capital stock was raised to $250,000 in 1905, then they clearly could not have understood from the course of business that another raise of the same character for $125,000 would be admissible for any purpose.

It is plain, therefore, that these directors at their meeting in June aforesaid, when Garnett retired, knew there were no assets or surplus of the company out of which a dividend of twenty-five per cent. or any other amount, could be declared. They likewise knew that unless the $125,000 should be added as good will for the third time the assets of every kind and description

were not sufficient by $76,000 to cover the capital stock. The action of said board, therefore, in declaring this dividend, was neither justified by the law nor facts.

III. The dividend heretofore mentioned as having been declared for $62,500 on June 8, 1909, was put in the form of non-negotiable notes and ultimately found its way as collateral security into the hands of Garnett, and was given to him as such by Allen to secure the purchase money which the latter owed Garnett, for the stock bought from him.

**Dividend in Form of Notes.**

On the 8th of June, 1909, Garnett knew all about the financial condition of the company, and what had been done in respect to the foregoing matters. In the deal which he made with Allen on said date, Garnett's note of $15,673 due the company for borrowed money was to be returnd to him by Allen. When this was done, it represented a transfer to Garnett of this amount of the company's assets. The evidence presented in the record sustains the conclusion reached by the referee and trial court, that Garnett received from Allen the money of the company, due on the non-negotiable notes of the company, held by Garnett as collateral security for Allen's note to him for the unpaid purchase money of stock. Garnett therefore knew that the money of the company was to be paid to him on account of said notes, and having received full payment from the company of the amount due thereon, it is clear that the finding of the referee, in regard to the amount of $80,487, is sustained by the record.

The action was only brought to recover the amount due as above stated. It does not take into account the fact that the $30,000 of good will which

went into the transaction of 1897, to make up the unpaid capital stock, was never accounted for by Garnett and the other directors. The referee and trial court might well have held him for his proportionate part of said $30,000, in accordance with the number of shares which he held, leaving out of consideration the $118,018.14, carried as good will in 1905, but as no claim is made in respect to this matter, the judgment of the trial court is well sustained by the evidence in the case.

IV.   It is contended by appellants that the trustee has no right to maintain this action because it does not appear that the debts allowed against the bankrupt were in existence on the 8th of June, 1909, when the above transactions occurred.

Remington on Bankruptcy (2 Ed.), vol. 3, sec. 47, page 2704, in respect to powers of trustees, says that the trustee "shall be deemed vested with all the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies and powers of a judgment creditor holding an execution duly returned unsatisfied."

These extensive powers given to the trustee are for the purpose of enabling him to uncover just such transactions as we have before us, and to restore to the corporation its capital stock which was wrongfully dissipated by its officers. It makes no difference in respect to this matter whether the debts represented by the trustee were contracted before or after the illegal acts complained of. Every creditor has a right, in the absence of proof to the contrary, to presume that the capital stock of every corporation has been paid in full, if advertised to that effect. In the case at bar, the company went into bankruptcy in less than two years after the proceedings on June 8, 1909, and

claims aggregating more than $254,000 were allowed against the bankrupt estate. These creditors, regardless of when their debts were contracted, had the right to assume that the capital stock amounting to $250,000 was fully paid as advertised, as nothing appears to the contrary in the record.

Instead, then, of the capital stock being intact for $250,000, it was deficient on June 8, 1909, to the extent of $76,000 before a .dividend was undertaken to be declared. With the $80,487 added to the $76,000, it discloses that the capital stock, including all assets of the company when Garnett had been fully paid was less than $100,000. Again, it is manifest that Garnett knew on the 8th of June aforesaid that the company would be rendered insolvent by the deal which he was then making, for the company was then short on its capital stock to the extent of $76,000, and this deficiency was to be increased by the dealings which they then had to the extent of $80,487, supra.

In this connection, observations made by FINCH, J., in People ex rel. U. T. Co. v. Coleman, 126 N. Y. l. c. 437-8, in regard to the relation between a corporation and a shareholder, are very appropriate. The question under consideration was one of taxation. He was considering the difference between capital stock and the shares of the corporation. On page 437, he said:

"Now, it is certain that the two things are neither identical nor equivalents. The capital stock of a company is one thing; that of the shareholders is another and a different thing. That of the company is simply its capital, existing in money or property, or both; while that of the shareholders is representative, not merely of that existing and tangible capital, but also of surplus, of dividend-earning power, of franchise and the good will of an established and prosperous business. The capital stock of the company is owned and held by the company in its corporate

character; the capital stock of the shareholders they own and hold in different proportions as individuals. The one belongs to the corporation; the other to the corporators. The franchise of the company, which may be deemed its business opportunity and capacity, is the property of the corporation, but constitutes no part or element of its capital stock; while the same franchise does enter into and form part, and a very essential part, of the shareholder's capital stock. While the nominal or par value of the capital stock and of the share stock are the same, the actual value is often widely different. The capital stock of the company may be wholly in cash or in property, or both, which may be counted and valued. It may have in addition a surplus, consisting of some accumulated and reserved fund, or of undivided profits, or both, but that surplus is no part of the company's capital stock, and, therefore, is not itself capital stock. The capital cannot be divided and distributed; the surplus may be. But that surplus does enter into and form part of the share stock, for that represents and absorbs into its own value surplus as well as capital, and the franchise in addition. So that the property of every company may consist of three separate and distinct things, which are its capital stock, its surplus, its franchise; but these three things, several in the ownership of the company, are united in the ownership of the shareholders." On page 439, the same learned judge said: "There are reasons in abundance for the conclusion that by the phrase 'capital stock' the statute means not the share stock, but the capital owned by the corporation; the fund required to be paid in and kept intact as the basis of the business enterprise, and the chief factor in its safety."

In Shields v. Hobart, 172 Mo. l. c. 517, GANTT, J., speaking for the Court in Banc, in discussing this question, said:

"Independently of this statute, which gives creditors an additional security against directors, it is a fundamental rule that dividends can. be paid only out of profits or the net increase of the capital of a corporation and cannot be drawn upon the capital contributed by the shareholders for the purpose of carrying on the company's business.

"Neither the directors of a corporation, nor even the majority of the stockholders, have any authority to diminish the prescribed capital of the corporation by distributing a portion of it among the shareholders in the shape of dividends, for this would be a fraud upon creditors contracting with it on the faith of its capital stock. . . .

"Dividends can only be properly declared from the profits over and above the capital stock and the debts of the company. [Barry v. Exchange Co., 1 Sandf. Ch. 1. c. 307; Williams v. Western U. Tel. Co., 93 N. Y. 162.]"

In Chrisman-Sawyer Banking Co. v. Independence Mfg. Co., 168 Mo. 1. c. 645, where the demand due the creditor was contracted subsequently to the matter complained of, MARSHALL, J., in behalf of the Court in Banc, in which all concurred, said:

"So that the law is now well settled in Missouri, as well as by the weight of authority in America, that unpaid stock subscriptions constitute an asset of an incorporated company, which all creditors, without regard to when their debts were contracted, have a right to look to and which cannot be extinguished, released, given away, wiped out or impaired by any act of the corporation or the stockholder to the injury of the creditor, except by his consent."

We are clearly of the opinion that, in a case of this character, where the trustee representing many creditors is suing, the law will presume, in the absence of evidence to the contrary, that such creditors in dealing with a corporation did so on the theory

that the capital stock was paid up and remained intact, if so advertised by the company, in its dealings with the public. In the absence of evidence to the contrary, it is fair to assume that every creditor, dealing with a corporation, and giving credit thereto, relies upon its capital stock as a means of safety to protect him in his investment.

Regardless of what may be held in other jurisdictions, we are of the opinion that the law as promulgated in the authorities above cited, announce correct principles of law as applied to the case in hand. We therefore hold that the respondent, as trustee of the bankrupt estate, is fully authorized to maintain this action.

Having discussed all the matters presented in appellant's brief, we have reached the conclusion that the judgment of the trial court in sustaining the findings of the referee, is supported both by law and evidence. The judgment below is therefore affirmed. *Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court. All the judges concur.