THE STATE EX REL. NORTH TODD GENTRY, Attorney-General, v. DANIEL BRAY, THOMAS L. HEALY, C. F. ROBERTS, WILBUR J. MANSFIELD, EARL K. TOWNSDIN, and MONARCH TRANSFER & STORAGE COMPANY.—20 S. W. (2d) 56 and 60.

Court en Banc, August 2, 1929.

*Stratton Shartel,* Attorney-General, for relator; *W. W. Graves, Manvel H. Davis* and *Ira B. Burns* of counsel.

*R. R. Brewster, James R. Page,* and *Carl L. Crocker* for respondent.

BLAIR, J.—This is an original proceeding by *quo warranto*, instituted by the Attorney-General of this State, seeking the ouster from its corporate franchise of Monarch Transfer & Storage Company, a corporation organized under the laws of this State and doing a general transfer and storage business at Kansas City. Our preliminary writ issued, returns were filed on behalf of said corporation and by Bray et al., directors thereof, all of whom were named as respondents. Informant, designated as relator in the information and hereafter so referred to, filed answer to the several returns of respondents. Thereafter Honorable Nelson E. Johnson was appointed as special commissioner of this court, with authority to report his findings of fact and conclusions of law. Said commissioner heard all the evidence and has filed his report. The case has been briefed and argued and is thus before us for decision.

Respondents embodied in their brief a motion for an order of this court affirming the findings of the special commissioner and dismissing relator's exceptions thereto, because relator failed to comply with our rules by serving upon respondents his printed abstract of the record thirty days before the case was set for hearing. Rule 33, taken in connection with Rules 12 and 16, fixes the penalty for such failure at dismissal of the original proceeding. We know of neither rule nor precedent for rendering judgment upon the merits in an original proceeding for violation of Rule 12.

The information charged that the original incorporation of Monarch Transfer & Storage Company in April, 1915, with authorized capital stock of $15,000, was in fraud, evasion and violation of the laws of this State and was an illegal usurpation of the franchises thereof. Said information also alleged that the increase of the capital stock of said corporation on September 14, 1920, was likewise in fraud, evasion and violation of the laws of this State and an illegal usurpation of the franchises thereof.

On August 16, 1926, this court handed down an opinion by WALKER, J., overruling respondents' demurrer to the information, except that portion thereof "in regard to the original improper incorporation of the company in 1915." While the parties to this proceeding have been furnished copies of said opinion, it does not appear to have been published officially or otherwise. It will be published in connection with this opinion. In view of said former ruling, the issue of fraud in the original organization of the corporation is out of the case.

In their statement of September 14, 1920, increasing the capital stock of respondent Monarch Transfer & Storage Company, stockholders Bray, Healy, Goodwin and A. V. and H. Cresto made the following statement:

"The amount paid up of the capital stock thus increased is $138,500 or 1385 shares, the remaining 115 shares are unsubscribed and unissued; that more than fifty per cent of said increase of capital stock has been actually paid up, part in cash, the balance in property of a cash value equal to par value of stock issued on increase, an itemized description of which, with the cash value of each item thereof, is as follows:

| | |
|---|---:|
| Real Estate (East 55 ft. Lot 158 Altamont Addition situate at Northwest corner 31st St. & Michigan Ave., Kansas City, Mo.) | $115,000.00 |
| Personal property (located at 31st St. & Michigan Ave., Kansas City, Mo.) | 30,000.00 |
| Motor Equipment | 30,000.00 |
| Inventory (including lumber, packing material, etc.) | 9,000.00 |
| Warehouse equipment | 4,000.00 |
| Furniture, fixtures & office supplies | 4,000.00 |
| Accounts receivable (good) | 7,500.00 |
| Cash | 5,500.00 |
| | 175,000.00 |
| Less Mortgage on Real Estate | 35,000.00 |
| | 140,000.00 |

In his report our special commissioner summarizes his findings in respect to the value of the corporate assets on September 14, 1920, as follows:

| | "Property | Fair Cash Value |
|---|---|---|
| (1) | Real Estate. East 55 ft. of lot 158 Altamont Addition, situate at the northwest corner of Thirty-first and Michigan Avenue, Kansas City, Missouri, together with improvements thereon | $130,316.76 |
| (2) | Motor Equipment | 20,875.00 |
| (3) | Inventory (including lumber, packing material etc.) | 9,000.00 |
| (4) | Warehouse Equipment | 4,000.00 |
| (5) | Furniture, Fixtures & Office Supplies .......... | 1,800.00 |
| (6) | Accounts Receivable | 7,500.00 |
| (7) | Cash | 5,500.00 |
| | | $178,991.76 |
| | Less mortgage on real estate | 35,000.00 |
| (8) | Total net fair cash value | $143,991.76 |

"That said property was in the hands of the board of directors of said Monarch Transfer & Storage Company at the time of the increase of its capital stock.

"That the statement of increase of capital stock of respondent Monarch Transfer & Storage Company from $15,000 to $150,000, and the procuring of the issuance of the certificate of said increase by the Secretary of State did not constitute a fraud, evasion or violation of the laws of the State of Missouri, or an illegal usurpation of the franchises thereof."

Assuming, as we must, that the original incorporation of respondent Monarch Transfer & Storage Company in 1915 was lawful, our special commissioner properly laid upon relator the burden of proof as to his charge that the subsequent increase of its capital stock in September, 1920, was "in fraud, evasion and violation of the laws of the State of Missouri, and an illegal usurpation of the franchises thereof." [State ex rel. Walker v. Talbot, 123 Mo. 69, 27 S. W. 366; State ex inf. Hadley v. Standard Oil Company, 218 Mo. 1, 1. c. 324, 116 S. W. 902; State ex rel. Union E. L. & P. Co. v. Grimm, 220 Mo. 483, 1. c. 491, 119 S. W. 626; 22 R. C. L. sec. 41, pp. 716 to 719; 32 Cyc. 1461.]

Relator cites and relies upon State ex inf. Attorney-General v. Hogan, 163 Mo. 43, 63 S. W. 378, to support his contention that the burden is upon respondents to prove that the increase of the corpo-

ration's capital stock was lawful. That was a case where the right of the corporation to exist was challenged because of fraud in its very inception and organization. The court said: "The burden was on respondents to show a compliance with the law." In that case respondents' return itself showed that it organized without a dollar of capital. There is nothing in the Hogan case in any wise in conflict with the Talbot, Standard Oil and Grimm cases above cited.

It is not questioned that the items of $7500 for good accounts receivable and for cash $5500, or a total of $13,000, were on hand September 14, 1920. Relator has not challenged the finding of value by our special commissioner as to warehouse equipment in the sum of $4,000. The item of furniture, fixtures and office supplies was put in by respondents at $4,000. The special commissioner fixed the value of such property at $1800, as of September 14, 1920, and relator appears to be satisfied with such finding. The special commissioner found the value of item "Inventory (including lumber, packing material, etc.)" at $9,000, which was the value placed thereon by respondents. This finding resulted largely from the failure of relator to sustain the burden of showing that respondents overvalued said item. One of relator's witnesses did, however, fix the value of a considerable amount of personal property, comprised in said items, at over $8600. Relator challenged the allowance of the special commissioner as excessive in his "exceptions" to the commissioner's report, but has not seen fit to press his complaint further.

We are satisfied that the evidence amply supports the finding of our special commissioner as to the value of the foregoing items at the time the capital stock of the Monarch Transfer & Storage Company was increased and deem it unnecessary to discuss the evidence in detail.

There are only two items in the special commissioner's report which we find are now seriously challenged by relator, to-wit, the finding that the value of the real estate on September 14, 1920, was $130,316.76, and that the value of motor equipment was $20,875 at that time. Respondents in their statement put in these two items at $115,000 and $30,000, respectively. The special commissioner therefore found that respondents had under-valued the real estate of the corporation more than $15,000 and had overvalued motor equipment by more than $9,000.

In arriving at his finding of value of motor equipment in the sum of $20,875, the special commissioner made the following itemized finding:

| 5-ton Special Federal Truck | $9,000.00 |
|---|---|
| 1½-ton Kelly-Springfield Truck | 3,200.00 |
| 2½-ton Kelly-Springfield Truck | 3,950.00 |

| | |
|---|---|
| 1-ton Mack Truck | 2,750.00 |
| 1-ton Ford Truck | 1,000.00 |
| 1 Ford Coupe | 975.00 |

The testimony disclosed that trucks were in unprecedented demand in September, 1920, and that used trucks, if kept up in good repair, were then selling for more than the same trucks cost new three, four and five years previously. The Monarch Transfer & Storage Company had kept their trucks in fine condition. Special bodies were built on the trucks and these were attractively painted and lettered. Without going into the details of the evidence, we feel fully justified in saying that we find no occasion to disagree with the finding of our special commissioner as to the value of motor equipment on September 14, 1920. He was fully warranted in saying in his report that "the evidence is undisputed that in September, 1920, the value of automotive equipment had reached its peak, the witnesses for the State testifying that, at that time, second-hand trucks were sold for $250 to $300 above their original purchase price, even though four or five years old, provided they had been kept in good repair. This condition was brought about by the inability of the manufacturers to supply the market—orders for trucks being booked months in advance."

Although the special commissioner found that respondents had overvalued motor equipment by $9125 at the time the capital stock was increased, he found that such overvaluation was not fraudulent. He said:

"In reaching this conclusion, however, the commissioner is not unmindful of the fact that the five-ton special Federal truck, because of its immense size and of the advertising campaign which had been put on concerning it, had a peculiar value to respondent company. Had this truck been destroyed, it would have been impossible to replace it for a period of months because of the condition of the automobile industry. This condition, so far as replacement is concerned, applies to the balance of the trucks, and although the commissioner finds that the motor equipment was over-valued, it is not his opinion that such over-valuation was a wilful deception, but rather that it results from the impossibility of placing a valuation upon the intangible worth of these trucks to respondent company, under the conditions then existing."

Respondents probably deceived themselves as to the value of their motor equipment. This also appears to have occurred as to certain paintings in the office to which an expert dealer in art, paintings, etc., gave little or no market value and which largely caused the special commissioner to find the value of furniture, fixtures and office supplies at $1800, instead of the value claimed when the capital

stock was increased. The overvaluation in both instances appeals to us as self-deception, rather than deliberate fraud or evasion on the part of respondents.

Relator's chief complaint against the special commissioner's report and the most serious conflict in the evidence are found in connection with the item of real estate. In 1915 the corporation purchased a lot fifty-five feet in width at the northwest corner of Thirty-first Street and Michigan Avenue in Kansas City, for which it paid $6,000. In 1917 it erected thereon a five-story and basement brick and concrete warehouse and storage building with garage attached. The cost of the labor and material alone for the building as originally planned amounted to $39,533.89. The evidence showed and the special commissioner found that the contractor's fee was $2500 in addition on the "cost-plus basis" and that the superintendence, which was furnished by respondent Bray, was of the value of $2400 more. He therefore found the original cost of the building alone to have been $44,433.89. He also found that permanent additions, amounting to $8700, were made on the building by the corporation, immediately after it was completed according to the original plans, which additions brought the total cost of the building to $53,133.89. Depreciation was held to have been practically negligible in September, 1920. This finding is not seriously challenged, as we understand the briefs.

Relator produced Messrs. Trueblood, Innis and Huselton, who qualified as experts on the value of improved real estate in Kansas City. Their acquaintance with the storage building was partly from an inspection of the building in 1925 and partly from a study of the original plans and specifications. They appear to have worked in concert, for they agreed on the value of $60,443 for the building and $7500 for the land, as of September 14, 1920, or a total of $67,943. It also appeared from the testimony of one or more of relator's witnesses that building costs were seventy-five per cent higher in 1920 than they were in 1917, when the building was erected. They did not take into consideration the $8,700 of immediate additions, which were shown to have been made on the building. Applying to the actual original cost of the building in the sum of $53,133.89, which we think was properly found by the special commissioner, the seventy-five per cent increase in cost of labor and materials, testified to by relator's witnesses, would bring the value of the building alone approximately to $93,000, as of September 14, 1920.

The testimony of relator's witnesses that the lot was worth $7500 in September, 1920, is opposed to that of at least four equally well qualified expert witnesses, produced by respondents, that the lot

was worth $300 per front foot, or a total of $16,500, in September, 1920. The special commissioner found that the value of the lot was $15,000 as of that date.

The increase of building costs of September, 1920, as compared to 1917, testified to by relator's experts, appears to be too small. Respondents' witnesses testified to much larger increases. A. D. Wolfe, a real estate man, said it would have cost $95,357 to reproduce the building in 1920, and said that the building filled with storage had a market value one-third greater than that. James E. Taylor, a general contractor, testified that labor and materials were 250 per cent higher in 1920 than they were in 1917. However, he fixed the reproduction cost of the building in 1920 at $108,784. H. H. Halverson, a real estate man, fixed the 1920 reproduction cost of the building at $105,000. David E. Long said it would then have cost $125,000. David Werby fixed the value of lot and building, together, in 1920, at $127,000. John T. Sears fixed it at $108,750.

Considering all the testimony, we are persuaded that the special commissioner was fully authorized in finding that it would actually have cost $109,111.21 to reproduce the building in September, 1920.

While the special commissioner did not base his findings as to the value of the lot and building upon rental value (nor do we), it is of interest to note that he made a calculation based upon the testimony of real estate experts who calculated such value on that basis. The building was completely filled and earning $1400 per month in rentals for storage in September, 1920. It was in evidence that the gross annual rental is usually considered eleven per cent of the market value of the property producing such rental. Using that method of calculation, the market value of the land and building in September, 1920, would have been $152,727.27. The rentals were for storage only. This income seems to have been independent of the general business of the corporation in moving, packing, etc., and apparently did not include any allowance for the space used by the corporation for such business or its general offices.

However, the special commissioner did allow the sum of $6205.55 "representing fairly the increased value of the building as occupied, over and above its value as vacant property." His allowance for this item was very modest, in view of the general course of the testimony, if it would be permissible to make any allowance whatever on that account. Relator strenuously argues that such allowance is not proper. Some of the witnesses testified that a building, like the one here under consideration and completely filled and earning rentals, is worth as much as 33 1-3 per cent more than a similar building would be worth if vacant. The special commissioner allowed only five per cent increased value on that account.

This element of value represents the good will or going-concern value and we think it was entirely proper to make a reasonable allowance on that account in determining the value of the corporate assets when the capital stock was increased. [28 C. J. 730; 14 C. J. 434; Beebe v. Hatfield, 67 Mo. App. 609, l. c. 615; Washburn v. National Wall-Paper Co., 81 Fed. 17, l. c. 20; Red Wing Malting Co. v. Willcuts, 15 Fed. (2d) 626; King v. Minneapolis, etc. Railway Co. (Minn.), 20 N. W. 135, l. c. 136.]

Relator has cited no cases ruling that good will, attending a successful business conducted honestly and in a manner satisfactory to those having dealings with it, is not a proper element of value which may enter into the capitalization of a corporation, just as such value may be and is considered as an element of value in the ordinary sale of such a business. In Coleman v. Booth, 268 Mo. 64, 186 S. W. 1021, relied upon by relator, the court found as a fact that the business had been so dishonestly conducted that the corporation was not entitled to a credit set up on account of alleged good will. But at the same time the court recognized that good will may have most substantial value in a proper case.

In Hess Warming & Ventilating Co. v. Burlington Co. (Mo.), 217 S. W. 493, cited and relied upon by relator, the increase of capital stock was not held void because value had been placed upon good will, but because "not a dollar was paid on the alleged increase." [L. c. 502.]

We are unable to see how any just criticism can be lodged against the finding of the special commissioner that an allowance of $6205.55 for good will should be made, because the storage house was fully occupied and a going, successful concern in September, 1920.

We have carefully read the entire record and agree with the special commissioner in all of his findings as to value. Not only has relator failed to establish the invalidity of the increase of the capital stock of respondent corporation in September, 1920, in accordance with the burden of proof under which he labored, but we think the preponderance of the evidence fairly supports the special commissioner in all of his findings. He was well within the evidence in finding that on September 14, 1920, the assets of respondent amounted to a total of $178,999.76, and that, after subtracting the existing mortgage on the land and buildings in the sum of $35,000, the "total net fair cash value" of said corporation's assets was then $143,991.76, or nearly $4,000 more than was represented as the value of the corporate assets when the capital stock was increased and the corporation had issued stock only in the sum of $138,500.

It follows that our finding of facts, under the conclusions of the law above announced, should be and is that respondents are not

guilty of fraud, evasion or violation of law or usurpation of their corporate franchises in procuring authority from the State for such increase of capital stock.

Much is made of alleged improper motives of certain stockholders in promoting the prosecution of the *quo warranto* proceeding for purposes of their own and the effect such alleged improper motives should have on our decision. But we find it unnecessary to lengthen this opinion further in the consideration of such question, since we have concluded that the cash value of the corporation's assets fully justified the increase of its capital stock at the time the increase was authorized.

It is accordingly ordered that the proceeding be dismissed. All concur, except *Walker, J.,* absent.

## ON DEMURRER.

WALKER, J.—This is an original action in the nature of an information by *quo warranto* brought by the State at the relation of the Attorney-General against the Monarch Transfer & Storage Company and others, claiming to be directors thereof, to oust the corporation from the exercise of such rights, privileges and franchises as it claims to possess, because of fraud practiced upon the State in the pretended increase of its capital stock. The information of the Attorney-General charges, in substance, that at the time of the issuance of the articles of incorporation to this company in 1915, there was not, nor has there been since, any part of the capital stock of same actually paid up in lawful money of the United States, or its equivalent in property which might answer the purpose of money; and at the time of said increase of said capital stock from $15,000 to $150,000 as attempted to be effected in 1920; that no part of said increase was actually paid up in lawful money of the United States or its equivalent in property of the full value thereof which might serve its purpose as money in conducting its business as a corporation.

To this information the Monarch Transfer & Storage Company and the individual defendants have filed a demurrer, as follows:

"1. That the information filed does not state facts sufficient to constitute a cause of action, in that it appears upon the face of the information and petition, that the relator's cause of action, if any, accrued more than ten years before the commencement of the suit and was completely barred by the Statute of Limitations;

"2. That the information shows upon its face that the defendant Monarch Transfer & Storage Company was issued a certificate of incorporation by the Secretary of State on April 1, 1915, and that

the articles of incorporation had prior thereto been duly recorded in the office of the Recorder of Deeds setting out in detail money and property alleged to have been used to pay up the capital stock of the corporation and that the State is estopped because it has ever since said date acquiesced and continued to recognize the defendant as a corporation;

"3. That the information shows upon its face that the suit is to contest the validity of the corporation and that the information is against the corporation and board of directors, instead of the individuals or stockholders of said corporation, and is therefore a defect of the parties defendant;

"4. That it appears upon the face of the information that several causes of action have been improperly united in one suit."

I. The plea of the Statute of Limitations as a ground of demurrer in a case of this character can only be made when the statute creates an absolute bar by the mere lapse of time without any exception, if the necessary facts therefor appear in the petition. [Knisely v. Leathe, 256 Mo. l. c. 341 and cases.] While "the necessary facts therefor" may appear so far as the allegation regarding the original incorporation in 1915 is concerned, if the demurrer be sustained as to this allegation enough remains to constitute a valid charge of an abuse of corporate franchise as to the fraudulent increase of capital stock in 1920. The gravamen of the information on which is based the ground of ouster, despite the superfluous paragraph in regard to the original improper incorporation in 1915, is the fraudulent increase of the capital stock in 1920. The demurrer is therefore not available as to this allegation. An illegal issue of stock by a corporation for less than par value or for property at an intentional and fraudulent overvaluation is a misuse of its powers and a ground for proceedings by the statute to forfeit its charter. [State ex inf. Attorney-General v. Hogan, 163 Mo. 43; Floyd v. State, 177 Ala. 169; State v. Citizens' Light, etc., Co., 172 Ala. 232; People v. Leadville City Bank, 7 Colo. 226; State v. N. O. Deben Redemp. Co., 51 La. Ann. 1827, aff. 180 U. S. 320; People v. Larsen, 265 Ill. 408.] Property listed as capital stock may be so overvalued as to constitute a fraud against the State and to invalidate the incorporation. This is what is charged to have been done in this case and it is sufficiently pleaded.

The second and third grounds of demurrer are what, in the terminology of the law, are designated as speaking demurrers, in that they allege affirmative matter which, taken with the allegations of the petition, shows no cause of action. Pleadings of this character are not recognized by our procedure. They are therefore worthless

as raising any question as to the sufficiency of the information. The purpose of a demurrer is not to raise an issue of fact nor does it prove an allegation of same. [Bennett v. Lohman, 292 Mo. 493; Pacific Lime & Gypsum Co. v. Missouri Bridge & Iron Co., 286 Mo. 112, 226 S. W. 853; Hubbard v. Slavens, 218 Mo. 598.]

As to the contention that there is a misjoinder of parties in the respondents named in the information. Eliminating the allegation as to the improper valuation of the capital stock under the original incorporation which is in effect a sustaining of the demurrer to this charge, there remains the State's contention that the corporation has violated and abused its power in its pretended increase of capital stock in 1920. It is usually held in *quo warranto* proceedings to oust a corporation from the use of corporate franchises that the action should be brought against the individuals charged with the unlawful use or exercise of same instead of against the corporation, for the reason that a suit against the latter in its corporate name is in effect an admission of its corporate existence. The correctness of this rule in principle may be admitted where the exercise of the corporate franchise was wholly unauthorized from the beginning. When, however, there was originally a regular corporate organization and it is sought to enforce a forfeiture, or where it is merely sought to oust a corporation from the exercise of particular franchises unlawfully assumed, the proceedings must be against the corporation and not merely against its officers and stockholders. [State ex inf. Berkley, Pros-Atty., ex rel. McCormack, v. McClain, 187 Mo. 409; State ex inf. Atty-Gen. v. Fleming, 147 Mo. 1.]

The rule has been most tersely stated in Rex v. Amery, 2 Term R. 523, where in citing from Lord Hale's Com. Pl. Book it was quaintly said; "If *quo warranto* be brought for usurping to be a corporation, it should be brought against particular persons because in disaffirmance of the corporation; but if it be brought for liberties claimed by a corporation it must be brought against the corporation itself." [Cited in State ex inf. v. Fleming, supra.]

Here the original legal existence of the corporation, with the elimination of the allegation in regard thereto, is not questioned; and we have under one view of the facts a proceeding against the individual respondents for usurping to be a corporation and under another view a proceeding against the originally regulated incorporated company for liberties claimed since its fraudulent act. It was, therefore, proper to join the corporation and the individuals as respondents. Under the liberal construction given pleadings by our modern procedure, especially in regard to a misjoinder of parties and with a view to the substantial administration of justice, the join-

der of the corporation and that of the individual stockholders as respondents was not error. [State ex rel. Perkins v. Long, 275 Mo. 169.]

From whatever vantage this case is viewed it involves but one question, viz.: the fraudulent character of the attempted increase in the capital stock, whether it be construed to be the act of individuals or that of the theretofore valid corporation. There is therefore no misjoinder of the parties.

Involving, as this case does, the corporate existence of the respondent, named as a corporation, it is pertinent, in addition, to consider the general sufficiency of the information. In a proceeding in the nature of *quo warranto* asking for a judgment of ouster when, as at bar, the proceeding was *ex officio* by the Attorney-General it is unnecessary that the pleading on its face show anything more than that the corporation assumed usurped and unlawfully exercised corporate privileges. This is sufficient to put it on its defense. Although the information may have undertaken to specify the grounds upon which it proceeds, this does not alter the case. [State ex inf. Atty.-Gen. v. Hogan, 163 Mo. 43.] Further than this, if a corporate franchise is claimed by the State to have been usurped it need only be alleged generally that the franchise is being exercised without lawful authority and as against the State, and it then devolves upon the respondent to show a complete legal right to use and enjoy the privilege in question. This is the general rule, to which may be added that when the purpose of the proceeding is to perfect the charter the grounds of the forfeiture must be specifically pleaded. [State ex rel. Union Elec. Light & Power Co. v. Grimm, 220 Mo. 483.] The specific charge made in the present proceeding is a fraudulent and pretended increase of capital stock. This is pleaded with sufficient particularity to meet the requirements of the rule in that the respondents be informed as to the nature of the charge made against them to enable them to make their return in defense to the same. This constitutes sufficient information for the reason that the sole question for consideration is whether there has been a misuse and abuse of corporate rights granted by the articles of incorporation and whether rights not granted have been usurped. [State ex rel. v. Hannibal etc. Co., 27 Mo. App. 496.]

In short, the rulings here and elsewhere in which it is sought to oust a corporation from the exercise of corporate franchises when brought upon the information of the Attorney-General for the State, is sufficient if the powers alleged to have been usurped by the corporation are clearly and definitely stated. The demurrer therefore, so far as it can be considered as such, is overruled, except as to that

portion in regard to the original improper incorporation of the company in 1915.

The effect of the demurrer is to admit the truth of matters well pleaded in the information. In the presence of this well-established rule and this being an original proceeding it should be speedily determined. If within ten days the respondents so desire, return may be made to the information; otherwise, judgment will be rendered as prayed by the relator. All concur, except *Graves, J.,* absent and *Otto, J.,* not sitting.