## HESS WARMING & VENTILATING COMPANY, Appellant, v. BURLINGTON GRAIN ELEVATOR COMPANY et al.

### Division Two, December 4, 1919.

1. **FRAUDULENT CONVEYANCE: Foreign Creditor: Legality of Judgment.** A foreign corporation has a legal right to enter into a contract in the state of its domicile to erect in the elevator of a Missouri corporation a grain drier and cooler, and to send its superintendent or other expert mechanic into this State to install the same, without taking out a license to do business in this State, and a judgment for the contract price of such machinery rendered in behalf of such unlicensed foreign corporation in a Missouri court is not illegal.

2. ———: ———: ———: **Collateral Attack.** In a suit brought by a foreign corporation to set aside a deed of trust and a foreclosure

sale thereof, as having been made in fraud of creditors, the defendants are not entitled to a ruling on the question that the judgment by which such plaintiff established its claim against the grantor in such instrument was illegal for that the plaintiff was not authorized to do business in this State. The Missouri court in rendering said judgment necessarily determined that plaintiff had a right to sue in the courts of this State to establish its claim, and the judgment being final it cannot be collaterally attacked.

3. ———: ———: ———: Estoppel. In a suit to set aside a conveyance as fraudulent, brought by a judgment creditor of the grantor, neither the grantor nor the grantee is in a position to insist that the court of equity should close its doors to such foreign plaintiff, where its judgment for machinery sold and installed has not been paid and it still remains in their hands and its use is enjoyed by them.

4. CORPORATION: Increase of Stock: Certificate of Secretary of State: Based Upon False Statement. The certificate of the Secretary of State that the capital stock of a corporation has been increased is not conclusive upon its creditors in a suit in equity. Both under the Constitution and the statutes the capital stock of a corporation can be increased only "for money paid, labor done or property actually received," and if the chairman and secretary of the stockholders certify to the Secretary of State that "the full amount of said increase of capital has been actually paid up in lawful money, and is in the hands of its board of directors," and by such certificate obtain a certificate from the Secretary of State certifying that said corporation "has complied with the law made and provided for the increase of its capital stock," creditors of such corporation may in a court of equity show that the certificate of the chairman and secretary was false, and that no money was paid into the hands of the board of directors for the increased stock. Courts of equity will not permit corporations by illegal and fraudulent methods, to ignore both the Constitution and statutes; and if the certificate of the Secretary of State, based upon a false and manufactured record, were conclusive on courts of equity, its conclusiveness would open wide the doors of fraud; and if the statutes intended that his certificate should be conclusive, in the face of such fraud, they would be violative of the clear language of the Constitution and void.

5. ———: ———: Issue of Bonds. The bonded indebtedness of a corporation cannot be legally increased to an amount in excess of its authorized capital. So that where the existing bonded indebtedness of a corporation equalled the full amount par-value of its stock, all bonds issued thereafter. based upon a void and illegal increase of stock, in the hands of persons who had actual knowledge of such illegal increase. are likewise void.

6. ———: ———: ———: **In Payment of Antecedent Debt.** Both the Constitution and the statute, in express terms, prohibit a corporation to issue bonds in payment of an antecedent debt.

7. ———: ———: ———: **Trustee Ex Maleficio.** A bank, which, without authority from the board of directors, wrongfully obtains possession of bonds issued by a corporation, with both actual and constructive notice that they have been illegally issued, holds them as trustee *ex maleficio* for the benefit of the corporation's creditors and stockholders.

8. ———: ———: ———: **Void Deed of Trust.** As against a subsequent judgment creditor, the illegal increase of the capital stock of a corporation, the bonds based on such illegal increase, a deed of trust made to secure the payment of such bonds, the negotiation of the bonds to a bank, and the foreclosure sale of the property to a director of the bank for it, all done with actual and constructive notice that the increase of the stock was illegal, are void, and will be set aside, in order that such judgment may become a prior lien on the property.

9. **FRAUDULENT CONVEYANCE: Judgment: Acceptance of Debt.** Where the judgment creditor in his petition to have set aside a deed of trust on real estate as made in fraud of his rights, offers to accept payment of his judgment and all costs, in lieu of title and possession of the property, a judgment may be rendered in the alternative, requiring defendants to pay the first judgment, with interest, and all costs in both proceedings, within a time stated, and plaintiff to execute a quit-claim deed to the purchaser under the deed of trust, or if payments are not made within said time that plaintiff be placed in possession.

Appeal from St. Louis City Circuit Court.—*Hon. William T. Jones*, Judge.

REVERSED AND REMANDED (*with directions.*)

*Eliot, Chaplin, Blayney & Bedal* for appellant.

(1) Plaintiff's contract for furnishing delivery and erection of the grain drier and cooler was a transaction in interstate commerce, and therefore plaintiff did not need a license to do business in Missouri. State ex rel. Hays v. Robertson, 271 Mo. 485; Brownrig v. Waycross, 233 U. S. 16; York Manufacturing Co., 247 U. S. 21. That plaintiff's contract was in interstate commerce

166     SUPREME COURT OF MISSOURI.

Hess Warm. & Vent. Co. v. Grain Elevator Co.

was *res adjudicata* by reason of the judgment plaintiff got on the same in the circuit court, and the matter cannot be re-opened in this case where plaintiff is suing as a judgment creditor by reason of said judgment. (2). Plaintiff sues as a judgment creditor. Plaintiff's purchase at the execution sale does not place plaintiff in the shoes of the Elevator Company. Bradshaw v. Halpin, 180 Mo. 667; Lionberger v. Baker, 88 Mo. 455; Rinehart v. Long, 95 Mo. 401. Although plaintiff, as purchaser at the execution sale, is entitled to recover the property itself, plaintiff in this case is offering to do equity by asking for only such judgment as will make plaintiff whole on the money due on its judgment gotten in the St. Louis Circuit Court. Oldham v. Wade, 273 Mo. 231. (3) Where the stockholders and directors of a corporation have authorized its officers to sell its bonds, this authorization does not include the power to pledge. Shaw v. Saranac Horse Nail Co., 144 N. Y. 220. (4) The bonds were void because (a) in excess of the authorized capital stock, or (b), if validly issued, because they were not issued with the consent of stockholders holding the larger amount in value of the stock. Sec. 2981, R. S. 1909; Art. 12, sec. 8, Mo. Constitution. (a) The object of the lawmakers in making such provisions was to make stocks and bonds of a corporation worth their face value. Peoria Railroad Co. v. Thompson, 103 Ill. 187; Mayfield W. & L. Co. v. Graves County B. & T. Co., 170 Ky. 86; Altenberg v. Grant, 85 Fed. 345. (b) The constitutional and statutory provisions being one and the same as to stocks and bonds, what this court has said as to stocks is likewise the law as to bonds. Mudge v. Black, 224 Fed. 923. (c) Repeated decisions of this court have established that the provision of the Constitution and statute (Art. 12, sec. 8, Constitution, and Sec. 2981, R. S. 1909) to the effect that no corporation shall issue stocks or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void, make it indispensable to the issue of

stock by a corporation that such money, labor or property be equal in value to the par value of the stock issued. Garrett v. Kansas City M. Co., 113 Mo. 330; Van Cleave v. Berkley, 143 Mo. 109; Berry v. Rood, 168 Mo. 316; Hunter v. Garanflo, 246 Mo. 131.  (d)  Other courts have so held in connection with similar constitutional or statutory provisions of other states.  Lyon v. Bleeg, 240 Fed. 405; Progressive Wall Paper Corp., 229 Fed. 489; Chavelle Trust Co., 226 Fed. 400; Pacific Coast Pipe Co. v. Water Co., 237 Fed. 673; Farmers Loan & Trust Co. v. Car Co., 45 Fed. 518; Waterloo Organ Co., 134 Fed. 341; Rolapp v. Railroad Co., 37 Utah, 540; Wyoming Valley Ice Co., 153 Fed. 787; Guarantee Title & Trust Co. v. Coal Co., 235 Pa. St. 594; Gunnison Gas & W. Co. v. Whitaker, 91 Fed. 191; Edgar v. Ames, 255 Fed. 835.  (e)  The seizure by the bank of the seventy-two bonds left with it on special deposit (safe keeping) and attempted application of them as further collateral was void and these bonds were never issued.  6 C. J. 1114, 1132; Smith v. State Bank, 30 L. R. A. (N. S.) 517; 7 C. J. 660; Reynes v. Dumont, 130 U. S. 354; Bock v. Gorrisen, 2 DeG. F. & J. 343.  (5)  Since the bank took the twenty-five bonds and Van Blarcom the three bonds as security for pre-existing indebtedness they are not bona-fide holders thereof, but hold the same subject to all infirmities.  Johnson v. Grayson, 230 Mo. 401; Loewen v. Forsee, 137 Mo. 42;  Board of Trustees v. Fry, 192 Mo. 563.  Even if the purchaser at foreclosure under the second mortgage had been an innocent purchaser he would not have taken a good title.  Coquard v. Cotton Compress Co., 7 S. W. 184; Hagerman v. Sutton, 91 Mo. 531; Jackson v. Johnson, 248 Mo. 681.  (6)  Where the sale on foreclosure was made on the theory that all of the 100 bonds of the second mortgage were outstanding and due, the sale should be set aside and the title passing under it invalidated even though some few bonds might be held to be outstanding and due. James v. Milwaukee Ry. Co., 6 Wall. 752; Edgar v. Ames, 255 Fed. 835.  (7)  The bank was a purchaser with

notice. Progressive Wall Paper Corp., 229 Fed. 498; Board of Trustees v. Fry, 192 Mo. 522. (8) The syndicate for which George Lane Edwards was acting and the corporation subsequently formed by the syndicate are purchasers with notice. Kitchen v. Ry. Co., 69 Mo. 224: Berry v. Rood, 168 Mo. 316; Smith v. Farrell, 66 Mo. App. 11; Leonard v. Latimer, 67 Mo. App. 145; Stene Cettler v. Myers, 64 Mo. App. 527; Withers v. Bank, 67 Mo. App. 115, 125; Mechem on Agency (2 Ed.), p. 1421, secs. 1837, 1838 and 1839; Kelsay v. Farmers' Bank, 166 Mo. 157; Hendricks v. Calloway, 211 Mo. 563; Eoff v. Irwine, 108 Mo. 378; Zweigart v. Reed, 221 Mo. 33; McCaskill v. United States, 216 U. S. 514.

*Geo. L. Edwards, Edward D'Arcy* and *D'Arcy & Neun* for respondents.

(1) The contract under which appellant claims to have obtained its judgment, and the judgment obtained thereon, was illegal, and, therefore, appellant has no right to equitable relief in this court. Secs. 3038, 3039 and 3040, R. S. 1909; In re Springfield Realty Co., 257 Fed. 785; Amusement Co. v. Amusement Co., 192 Mo. 405; Roades y. Robertson, 202 Mo. 535; Zinc & Lead Co. v. Zinc Mining Co., 221 Mo. 12. (2) The judgment in favor of the appellant in its former suit against the Burlington Elevator Company is not *res adjudicata* as to the validity of appellant's contract, as against these respondents. Clark v. Bettelheim, 144 Mo. 271; Graves v. Ewart, 99 Mo. 13; 23 Cyc. 1068, note 92; 23 Cyc. 1207, note 40. (3) The certificate of the Secretary of State to the effect that the capital stock of the Burlington Elevator Company was increased from $150,000 to $200,000 is conclusive upon the parties to this action. Sec. 3356, R. S. 1909; Bank v. Rockefeller, 195 Mo. 15; Boatmens' Bank v. Gillespie, 209 Mo. 217; Wells v. Gastonia, 198 U. S. 177; Scott v. Abbott, 160 Fed. 573. (4) The bonded indebtedness of the Elevator Company was, as a matter of fact, increased, and the second mortgage

bonds issue in compliance with the law. Sec. 2981, R.
S. 1909. (5) Knowledge which Van Blarcom, as pres-
ident of the Elevator Company, may have had concern-
ing irregularities in the issuance of the bonds, cannot
be imputed to the Bank of Commerce. The bank was an
innocent holder of the second mortgage bonds, and as
such is not affected by any defects in the bonds arising
out of informality in their issuance. Benton v. German-
American Bank, 122 Mo. 332; 2 C. J. 864, note 93; 3
Cook Corp. (7 Ed.) pp. 2464, 2571, 2572, 3023; Louis-
ville Ry. v. Louisville Tr. Co., 175 U. S. 552; Secs. 10026,
10027, R. S. 1909. (6) A pre-existing debt constitutes
value, since the law on that subject was changed in 1905.
Sec. 9996, R. S. 1909; Worth v. Marshall Field Co., 240
Fed. 395. (7) Even where there are irregularities in
the issuance of bonds, nevertheless where the corpora-
tion receives and retains benefits derived from the dis-
position made of the bonds, the validity of the bonds
cannot be questioned, either by the corporation or those
claiming through it, until the benefits received have been
repaid. First Nat. Bank v. Trust Co., 187 Mo. 494;
Fidelity Co. v. Western Pa. R. Co., 138 Pa. St. 494, 21
Am. St. 911; Wood v. Corry Water Works Co., 44 Fed.
146, 12 L. R. A. 168; Wright v. Hughes, 119 Ind. 324,
12 Am. St. 412; Osmer v. Brokerage Co., 155 Mo. App.
211; Re Waterloo Organ Co., 134 Fed. 345; Hitchcock
v. Galveston, 96 U. S. 341, 24 L. Ed. 659; Zabriskie v.
Cleveland R. Co., 64 U. S. 381, 16 L. Ed. 488. (8)
Statutory provisions requiring a meeting of stockhold-
ers, and the giving of their consent to corporation
action, are for the benefit of the stockholders. The cor-
poration or its stockholders alone can take advantage
of the non-compliance with such statutes. Creditors of
the corporation cannot raise the issue. 3 Cook Corp.
(7 Ed.) p. 3015, note 2; Campbell v. Argenta Mining
Co., 51 Fed. 1; Farmers Loan & Tr. Co. v. Ry., 68 Fed.
412; Hamilton Tr. Co. v. Clemes, 17 N. Y. App. Div.
152, 163 N. Y. 423. (9) Outsiders cannot raise the
question of *ultra vires*. The State alone, and not cor-

porate creditors, can raise this issue. First Natl. Bank
v. Trust Co., 187 Mo. 535; Wood v. Corry Water Works
Co., 44 Fed. 146, 12 L. R. A. 168; Columbia National
Bank's Appeal, 16 W. N. C. 357; Union Natl. Bank v.
Matthews, 98 U. S. 621, 25 L. Ed. 188; Fritts v. Palmer,
132 U. S. 282, 33 L. Ed. 317; Hill v. Rich Hill Mining
Co. 119 Mo. 31; Sears, Corp. pp. 268, 269; Mt. Vernon
Bank v. Porter, 52 Mo. App. 244; Cass Co. v. Ins. Co.,
188 Mo. 15. (10) A creditor who, like appellant, pur-
chases the property of his debtor, at execution sale, is
in privity of estate with the debtor, and stands in his
shoes, in relation to the property purchased. Jones v.
Hubbard, 193 Mo. 162, 165; Mechanics' Bank v. Bank,
45 Mo. 513; Foster v. Potter, 37 Mo. 525; 17 Cyc. 1289,
note 27.

RAILEY, C.—On May 19, 1911, plaintiff filed, in
the Circuit Court of the City of St. Louis, Missouri, its
bill in equity, as a judgment creditor, to set aside and
cancel certain conveyances, which it is claimed, consti-
tuted a cloud on its title to the real estate hereafter
mentioned, or to have said judgment declared a first and
prior lien on said real estate. The pleadings are very
voluminous, and in order to obviate repetition, we will
simply state briefly the outline of the issues and refer
to the pleadings more fully, when necessary, in the opin-
ion.

As a matter of convenience, we will hereafter refer
to the Burlington Elevator Company as the Elevator
Company; the Burlington Grain Elevator Company
as Grain Company; the National Bank of Commerce as
Bank, and the Mississippi Valley Trust Company as
Trust Company.

It appears from the petition, that plaintiff is an
Illinois corporation, with its chief office at Chicago. The
defendants, Grain Company, Elevator Company and
Trust Company, are Missouri corporations. On Octo-
ber 8, 1912, plaintiff filed an amended petition. On
October 20, 1913, the bank, on its own motion, was per-

mitted to become a defendant herein. Each of the defendants, except the Elevator Company, filed a separate answer, in which the facts as claimed by them respectively, were set out.

The amended petition, among other things, alleges, in substance, that said Elevator Company, on March 25, 1896, leased from the St. Louis, Keokuk & Northwestern Railroad Company (a corporation), for a period of fifty years, from June 1, 1895, the 12.18 acres in controversy, located in the City of St. Louis, Missouri; that upon said leasehold premises there were erected buildings and valuable improvements, in the nature of a grain elevator, with its appurtenances, all being the property of said Elevator Company; that prior to the 27th day of June, 1907, the Elevator Company was indebted to plaintiff, in the sum of $—— and has remained so indebted ever since said date; that on or about the 27th day of April, 1910, said debt was reduced to a judgment in the Circuit Court of the City of St. Louis, Missouri, in favor of plaintiff and against said Elevator Company, for the sum of $11,355, together with interest and costs; that on July 19, 1910, an execution was issued upon said judgment, and the real estate levied upon thereunder, and sold by the sheriff at public sale to plaintiff, as the highest bidder, on September 26, 1910, for a consideration of $500; that on October 7, 1910, plaintiff received a sheriff's deed to said property, which was duly filed for record in said City of St. Louis, on October 24, 1910, and recorded in Book 2394, at page 200; that on or about the 28th day of June, 1907, a majority of the directors of said Elevator Company called a meeting of the stockholders thereof, to be held on August 28, 1907, at the company's office, in Room A, National Bank of Commerce Building, St. Louis, Missouri, for the purpose of voting upon the following propositions: A. To increase the capital stock of the company, from $150,000 to $250,000 and sell said increased stock, for the purpose of providing additional capital for the company. B. To increase the

bonded indebtedness of the company from $150,000 to $250,000; also for the purpose of providing additional capital for the company. That at the meeting of the stockholders on August 28, 1907, all of the stockholders were not present by proxy, nor in person; that it was reported, a majority of the stockholders had voted for said increase; that on October 14, 1907, the chairman of the meeting, last mentioned, subscribed and swore to a certificate to the effect that at the above meeting there were present in person and by proxy at least a majority of the stockholders, holding the larger amount in value of all the shares of stock of said company; that a proposition was then submitted to increase the capital stock from $150,000 to $250,000 and, upon canvassing the vote, it appeared a majority of the stock of said company had been voted in favor of said increase; that the amount of the capital stock of said company, paid up, was $150,000; that the amount of its assets was $500,000; that its liabilities were $350,000; that the amount to which the capital stock had been increased was $250,000, divided into 2500 shares of the par value of $100 each; *"that the full amount of said increase of capital had actually been paid in lawful money of the United States and was in the hands of the board of directors of said company."* (Italics ours). That said certificate of the chairman was recorded in St. Louis, and a copy of same forwarded to the Secretary of State of Missouri; that on October 19, 1907, said Secretary of State certified that the capital stock of said Elevator Company had been increased to $250,000.

The petition avers that said certificate of the chairman was false, in this, that the full amount of said increase of capital stock had not been actually paid up in lawful money of the United States, or otherwise, and was not in the hands of the board of directors of said company; that, in point of fact, no subscriptions were ever made taking up the whole, or any part, of such purported increase of capital stock; that, in point of fact, fifty per cent of said purported increase of capi-

tal had not been paid up in lawful money of the United States, or in property of that value, and was not in the hands of the board of directors of said company, nor any part thereof; that none of this purported increase of capital stock was ever issued, nor paid up, and that, at the date of the judgment acquired by plaintiff, as aforesaid, against the Elevator Company, April 27, 1910, the total capital stock of the company, subscribed and issued, was only $150,000; that said purported increase of capital stock was not intended by said corporation to be, in fact, a bona-fide increase of capital stock, but was merely designed to be a sham and pretext to obtain a purported increase of capital, from the then capital of $150,000 to a purported capital of $250,000, to enable said corporation to increase its bonded indebtedness from the then indebtedness of $150,000 to $250,000, by reason of the fact that, under the laws of Missouri, no corporation can issue bonds in excess of its authorized capital stock.

It alleges, that said increase of capital stock was in violation of Section 8 of Article 12 of our Constitution, which provides that no corporation shall issue stock or bonds, except for money paid, labor done or property actually received and that all fictitious increase of stock or indebtedness shall be void; that said increase of the capital stock was likewise in violation of Section 2981, Revised Statutes, 1909, for the same reasons assigned in the Constitution aforesaid; that by reason of the foregoing, said increase of stock was fictitious and void; and that the capital stock of said Elevator Company was not, by reason of the action of the stockholders on said 28th day of August, 1907, nor by reason of the certificate issued by the Secretary of the State of Missouri, on the 19th day of October, 1907, lawfully authorized and increased from $150,000 to $250,000.

It is further alleged that on said 28th day of August, 1907, at said meeting, a resolution was presented to increase the bonded indebtedness of said company, for the purpose of raising additional capital, by issuing

$100,000 par value additional bonds maturing at such times, and bearing such rates of interest, as might be provided, by said resolution of the board of directors, who were authorized to cause said bonds to be executed; that said resolution was only adopted by the vote of the persons holding the larger amount in value of the stock of the then authorized capital stock, to-wit, $150,000, and not by the vote of the persons holding the larger amount in value of the purported increase of stock, to-wit, $250,000; that thereafter, at a meeting of the board of directors of said company, on October 19, 1907, it was voted that said company issue 100 bonds of the denomination of $1,000 each, to bear date of January 2, 1908, payable to bearer at the Trust Company on January 1, ——, and to bear interest at eight per cent, and the bonds to be signed by the president and vice-president, with coupons attached, payable January and July each year; that thereafter, in purported pursuance of the direction of the stockholders and directors, as aforesaid, said 100 bonds were prepared and executed, in the name of the Elevator Company, by an instrument and conveyance in the nature of a deed of trust, to the Trust Company, as trustee, for the bondholders, which was recorded in Book 2100, page 1, of the Recorder's Office of St. Louis, Missouri, upon the leasehold premises and buildings, belonging to said Elevator Company, which constituted practically all the property of said company; that said Trust Company endorsed, pursuant to the terms of said mortgage, its certificate on each of said bonds; that the action of said stockholders and directors, in making and executing said bonds and mortgage, was wholly void and nugatory; that under and pursuant to Section 8 of Article 12 of the Constitution, the bonded indebtedness of the corporation could not be increased, except in pursuance of general law, and it is provided by Section 2981, Revised Statutes 1909, that the bonded indebtedness of a corporation shall not be increased so that the entire amount thereof shall exceed the amount of the authorized capital.

It is further alleged, that said purported increase of capital stock from $150,000 to $250,000, being fictitious and void, the authorized capital of said corporation was only $150,000 and that at said date, and at said time, when the corporation undertook to increase its bonded indebtedness, it had outstanding $150,000 of the first mortgage bonds; that by reason of the foregoing, the bonded indebtedness aforesaid, was not authorized by the laws of the State of Missouri.

It is further alleged that said increase of bonded indebtedness, as aforesaid, was nugatory and void, under and by virtue of Section 8 of Article 12 of the Constitution and Section 2981, Revised Statutes, 1909, even if, under the facts hereinbefore alleged, it can be stated that. its authorized capital was $250,000, for the reason that the persons holding the larger amount of value of the capital stock of the corporation, did not vote to authorize the increase of the bonded indebtedness to $250,000, but, in point of fact, less than $125,000 of the capital stock of the corporation voted for said increase of bonded indebtedness from $150,000 to $250,000; that by reason of the foregoing, said increase of bonded indebtedness and the bonds issued in pursuance thereof, together with the mortgage executed to secure same, were null and void and of no effect.

It is further alleged that said action of the stockholders at said meeting of August 28, 1907, and of the directors, at the meeting of October 19, 1907, and of the officers of the corporation, in authorizing the making of said bonds and mortgage, was null and void, in this: That said increase of bonded indebtedness was fictitious by reason of the facts aforesaid, and was prohibited by the sections of the Constitution and statute heretofore mentioned.

It is further alleged that said attempted increase of bonded indebtedness, and the bonds purporting to be issued, under the circumstances aforesaid, were fraudulent as to this plaintiff, who was a creditor at that time, and that said purported increase of capital stock, and

176 SUPREME COURT OF MISSOURI.

Hess Warm. & Vent. Co. v. Grain Elevator Co.

said purported increase of bonded indebtedness, as well as the bonds purported to be issued in pursuance thereof, were made with intent to defraud this plaintiff, and that the said issue of said bonds, and the execution of the deed of trust to secure the same without, in fact, first paying up the capital stock as required by law, constitutes fraud against this plaintiff.

It is further averred that after the Trust Company certified said 100 bonds, they were delivered by the Trust Company to the Elevator Company and said bonds were not thereafter, by the Elevator Company, sold, transferred, assigned, negotiated or delivered to any person or persons, individual or corporations whatsoever; that although the notice calling for the meeting on August 28, 1907, was to determine upon the issuance of the increase of the bonded indebtedness from $150,000 to $250,000 for the purpose of providing additional capital for the company, and the stockholders did attempt to so authorize said increase, yet, none of said bonds were sold, transferred, assigned, negotiated or delivered.

It is further alleged that at all the times hereinbefore mentioned, one J. C. Van Blarcom was a director of said Elevator Company and that the president and secretary of said company, after the certification of said 100 bonds, without authority either from the stockholders or the directors, and at the solicitation of said Van Blarcom, who was a director of said Elevator Company, wrongfully and fraudulently, without the knowledge, consent, authorization or ratification of said corporation or its stockholders, pledged three of the 100 bonds as security and collateral for an indebtedness owed by the Elevator Company to said Van Blarcom.

It is further alleged that the president and secretary of said Elevator Company did, without the knowledge, consent, authorization or ratification of the stockholders or directors of said Elevator Company, further pledge, at the solicitation of said Van Blarcom, certain other of said bonds, not exceeding twenty-seven in number, as

security for a past-due indebtedness of said Elevator Company to the bank.

It is averred that said Van Blarcom, at the time of said unauthorized pledges of said bonds, was the president and director of said bank, and acting for it in said matters, and that he knew the purposes for which said bonds were authorized, and knew that said pledges had not been authorized by the Elevator Company; that by reason thereof, said pledges of the bonds aforesaid, passed no title thereto, to either Van Blarcom or to the bank; that said pledges of bonds were never confirmed or ratified by the Elevator Company.

It is further averred that the president and secretary of the Elevator Company took the balance of said 100 bonds to the bank in the City of St. Louis, and, without authority from the Elevator Company—which lack of authority was known to the bank—left said bonds in the hands of said bank, as a depositary for safe-keeping of same, until the Elevator Company should call for them or any part of them; that, in leaving said bonds with the bank, the latter obtained no right, title or interest in any manner whatsoever in or to said bonds, but held them for the convenience of the Elevator Company, for purposes of safe-keeping: that thereafter, the bank, without authority and without the consent of the Elevator Company, its stockholders or directors, did unlawfully seize said bonds and attempt to apply them as further security and collateral for certain past-due indebtedness of the Elevator Company to said bank.

It is further alleged that said Van Blarcom, as pledgor of said three bonds, and said bank, as pledges of twenty-seven bonds, and as custodian of the balance of said 100 bonds, took the same with full knowledge of all the facts pertaining to the execution and issuance of same; that by reason thereof, they are charged with knowledge of the fact, that said capital stock was not, in point of fact, actually increased, and that said increase was fictitious: that said increase of bonded indebtedness was not lawfully authorized, but was illegal and

12—280 Mo.

fictitious;   and with the further fact, that said corporation had not authorized the pledging of said bonds, nor the appropriation of same for the corporation's indebtedness;   and with the fact that said bonds were never actually delivered by the corporation, or issued and negotiated by it; that by reason of the foregoing, neither said bank nor Van Blarcom obtained any right or interest in said bonds, and never became the holders thereof or any of them.

It is further alleged that none of the proceedings aforesaid, in regard to the delivery of said bonds to the bank, were known to the Elevator Company or to the stockholders thereof, nor to these plaintiffs, until after the property in controversy was advertised for sale under the deed of trust hereafter mentioned; that on the—day of August, 1908, the bank, claiming to be the holder of not less than one-fourth of the bonds outstanding, and in pursuance of the instrument in the nature of a deed of trust heretofore mentioned, requested the Trust Company, trustee in said purported deed of trust given to secure said bonds, to make a sale of the leasehold estate, buildings, etc., purported to have been conveyed in the deed of trust from the Elevator Company to the Trust Company, securing said second mortgage bonds, alleging, that there had been a failure on the part of the Elevator Company to pay certain coupons for a period of thirty days, and that said Elevator Company had failed to keep the covenants in said deed of trust; that thereafter, said Trust Company, in pursuance of said request, and in pursuance of the terms of said deed of trust, did allege that all of the bonds described in the deed of trust were outstanding and that certain coupons had remained unpaid for thirty days and that said Elevator Company had failed to keep the covenants aforesaid; that said Trust Company did purport to sell said leasehold estate, buildings, etc., and other property described in said deed of trust, and did advertise and sell said property pursuant to the terms of said second deed of trust; and did make and

execute a deed therefor to defendant George Lane Edwards, for the price and sum of $10,000, on the 23rd day of September, 1908; that said deed was filed for record in the Recorder's Office of the City of St. Louis, in Book 2172, at page 57.

It is further alleged that at said time the defendant George Lane Edwards was cognizant of all the facts heretofore alleged, was a director of said bank, acted for said bank and acquired said property for said bank; that he was its agent in making the purchase aforesaid, and in taking the deed as aforesaid; that said George Lane Edwards knew that the increase of the capital stock of the Elevator Company was fictitious, and had not in fact been subscribed, nor any part thereof paid for; that the increase of the bonded indebtedness was fictitious and unauthorized by law; that said bonds in fact had never, by authority of said Elevator Company, been negotiated, and that neither said Van Blarcom, nor said bank were holders of any of said bonds, and that the deed of trust securing the same was void; that the sale was not in fact requested by any of the lawful holders of said bonds, and that the sale, under said deed of trust, was also void as against this plaintiff; that none of the purported purchase price of said $10,000, except just so much as was necessary to pay to the trustee and defendants the expenses for making said foreclosure, was paid in cash, but was only paid for by the cancellation of said invalid bonds, which were in the possession and custody of said Van Blarcom and said bank with full knowledge of the facts aforesaid; that by reason of the foregoing, said George Lane Edwards acquired no right, title or interest in said premises as against this plaintiff, and that said deed from the Trust Company, as trustee, to him, was, as against this plaintiff, void and of no effect.

It is further averred that thereafter the said George Lane Edwards and wife, for "five dollars and other good and valuable consideration," remised, released and quitclaimed unto the defendant Grain Com-

pany, the premises heretofore described, in which it was stated that it was the intent of the grantors to convey to the grantee therein all the property, real and personal, conveyed to George Lane Edwards, by the Trust Company, trustee, by a certain deed executed by said Trust Company to said George Lane Edwards, dated September 23, 1908, and duly filed for record in the office of the Recorder of Deeds of the City of St. Louis in Book 2172, page 61.

Plaintiff further states that the defendant Grain Company took with notice of all the facts hereinabove recited, and that said defendant is in possession of the above described premises and the improvements thereon; that said conveyance from the Elevator Company to the defendant Trust Company, in the nature of the deed of trust to secure said bonds, the deed from the Trust Company to defendant George Lane Edwards and the deed from George Lane Edwards and wife to the Grain Company, constituted a cloud on plaintiff's title to the leasehold estate, heretofore described, and that plaintiff is without adequate remedy at law.

It is further averred that plaintiff does not desire to take any advantage on account of its purchase of the property under said execution sale, but is desirous that the same shall inure to its benefit, only in so far as may be necessary to secure to it the payment of its judgment, with interest thereon and costs; that plaintiff offers to convey the title which it has acquired under said execution sale and to satisfy said judgment, if said judgment, interest and costs are paid.

The petition concludes with a prayer for a decree asking that the deed from the Elevator Company to the Trust Company, the deed from the Trust Company to George Lane Edwards, the deed from George Lane Edwards and wife to the Grain Company, may be declared null and void and to no effect as against this plaintiff; that it may be adjudged and decreed that defendants took no interest in the above described premises by virtue of said conveyances; that the said con-

veyances and deeds be canceled and for naught held; that the Grain Company be adjudged and declared to surrender the possession of said premises and improvements to plaintiff, and that said property may be ordered sold, under the direction of the court and the proceeds applied, first, to the payment of the plaintiff the amount of its judgment with interest and costs, and that the balance be subject to the order of the court, either for the benefit of the Elevator Company or defendants' other creditors, or the Grain Company, as its interest may appear, *or* that said judgment, in favor of plaintiff rendered by the circuit court aforesaid, be declared a first and prior lien on said property, *or* that plaintiff's title to said property be declared paramount therein, as against defendants' and the latter ordered to deliver possession to plaintiff, unless said judgment, interest and costs be paid within a time to be fixed by this court, and for such other and further relief as may seem meet and proper.

The defendants, Bank, Trust Company, Grain Company and George Lane Edwards, each filed separate answers, putting in issue the allegations of the petition aforesaid, and alleging their respective theories of the facts, in reference to the transactions complained of in petition. The answers are voluminous, and it is not deemed necessary to extend this statement further by setting out the same or any part thereof. The pleadings of defendants will be considered, as far as necessary, in the opinion to follow.

In order to avoid repetition the evidence will also be considered hereafter.

On March 21, 1917, the court dismissed plaintiff's bill and entered judgment in favor of defendants in proper form. Plaintiff, in due time, filed its motion for a new trial, which was overruled and the cause appealed by it to this court.

I. At the outset, we are met with the following contention of respondents:

"The contract under which appellant claims to have obtained its judgment, and the judgment obtained thereon, was illegal, and, therefore, appellant has no right to equitable relief in this court."

Illegal Judgment.

On October 19, 1907, plaintiff, an Illinois corporation, entered into a written agreement with the Elevator Company, a Missouri corporation, containing the following provisions:

"For and in consideration of the sum of fifteen thousand, five hundred dollars, to be paid unto the party of the first part (Hess Warming & Ventilating Co.) as hereinafter stipulated, the said first party agrees to furnish, deliver and erect within the housing and upon the premises of the party of the second part at St. Louis, Mo., one No. 8 Hess Pneumatic Grain Drier and Cooler, same to be made ready for all connections with power, steam, conveyors, etc., which connections are to be provided by the party of the second part.

"The party of the first part will supply complete working plans and drawings for the housing of the drier, this housing to be erected by the party of the second part. . . .

"The party of the second part shall be responsible unto the party of the first part for loss or damage by fire while such material is on the premises of the party of the second part."

Respondents took the deposition of George Henry Hess, the president of plaintiff, who testified, among other things, as follows:

"The Hess Warming & Ventilating Company is incorporated under the laws of Illinois. Its principal office and place of business is in Chicago, Illinois. That corporation has never taken out a license to do business in the State of Missouri. That corporation has never had or maintained a public office or place of business in the State of Missouri, for the transaction of business."

On cross-examination, witness testified that Richeson, president of the Elevator Company, came to plain-

tiff's office at Chicago, the contract was prepared there, and the terms agreed upon, except as to the matter of payment. This was arranged by correspondence, and after plaintiff signed the contract through its president, it was sent to the Elevator Company, and signed by the latter. The material was sent by rail from Chicago to St. Louis, Missouri. It was prepared in Chicago. Practically everything relating to the installation of that contract was made in Chicago. Witness further testified:

"By installation, I mean the material for a drier is made up in Chicago and shipped, and when it reaches destination we send a superintendent or erector, our own superintendent, a man in our employ, living in Chicago; he goes to the job and hires men to assist in the installation of the machine only. These men are not men of our acquaintance, but are picked up in the neighborhood, employed on the particular job, and are then dismissed.

"A drier consists of grain racks, fans and steam coils, resting upon steel beams in the drier building; the different parts are placed in position and bolted together by these men under the instruction and direction of our superintendent. The connecting with steam and transmission of power to the machine is invariably performed by the purchaser and is not, as a rule, a part of our contract. The owner erects the building in which the drier is installed. We supply the plans and specifications, and local construction contractors in the employ of the purchasers erect the building. Those plans and specifications are prepared in our office in Chicago." He further testified:

"Q. Would it have been practicable to have made a contract with The Burlington Elevator Company for The Burlington Elevator Company to have put up this machine, to put up one? A. No, sir.

"Q. Why not? A. Because there are no men outside of our employ who are sufficiently acquainted or

trained in the installing of these driers to put them up successfully.

"Q. What has been your course of dealing in regard to putting up these machines of the larger type? A. They have always been sold with the condition that they were to be installed by our men.

"Q. Why? A. Because of the size and multiplicity of parts and the lack of acquaintance of outside mechanics with their construction.

"Q. Requiring the service of an expert? A. Yes, sir."

We are of the opinion that the above contention of respondents, on the facts presented in this record, is untenable, in view of the recent ruling of our Court in Banc, in State ex rel. v. Robertson, 271 Mo. l. c. 485, where FARIS, J., speaking for the court, said:

"We are of the opinion that any foreign, corporation without taking out a license in Missouri under Sections 3037, 3039, 3040 and 5342, Revised Statutes 1909, can under the commerce clause of the Federal Constitution, unhindered wholly by us or by the laws of this State, sell its type-casting machines or other commodities to citizens of this State under such terms as it sees fit (Kansas City v. McDonald, 175 S. W. 917; Wulfing v. Cork Co., 250 Mo. l. c. 731); that it can likewise sell repair parts to purchasers of its products or machines, and agree to send its skilled workmen and operatives into this State, at the expense of the users of its machines, to erect the same and teach the manner of the operation thereof. [Milan Milling Co. v. Gorten, 93 Tenn. 590; Flint & Walling Mfg. Co. v. McDonald, 21 S. E. 526.]"

To same effect are York Mfg. Co. v. Colley, 247 U. S. 21; Browning v. Waycross, 233 U. S. 21.

(a) It is admitted that plaintiff's demand was reduced to a judgment for $11,355, on April 27, 1910, in the Circuit Court of the City of St. Louis, Missouri; that an execution was issued on said judgment and the

Vol. 280]        OCTOBER TERM, 1919.            185

Hess Warm. & Vent. Co. v. Grain Elevator Co.

Collateral Attack. property in controversy levied on thereunder, sold to plaintiff at public sale, and a deed made to it for said property. There is no intimation in the record that any fraud was practiced upon the court in the procuring of said judgment. The legal right of appellant to maintain said action was conclusively established in the rendition of said judgment, without any appeal having been taken. The right of respondents, in this collateral proceeding, to inquire into the legality of said judgment was foreclosed by the latter. [Fitzgerald v. De Soto Special Road District, 195 S. W. l. c. 696-7; decided In Banc, where numerous cases are cited. To same effect are Southern Pacific Railroad v. United States, 168 U. S. l. c. 48-9, and Hartford Life Ins. Co. v. Ibs, 237 U. S. l. c. 673.]

(b) It is undisputed that the judgment heretofore mentioned, in favor of plaintiff for $11,355, with interest, represented labor and material furnished by plaintiff to the Elevator Company in the fall of 1907, Estoppel. and which went into the plant of the latter, located on the land in controversy. The Burlington Elevator Company is the common source of title, and the Grain Company claims title through it. No part of this judgment has been paid, and the Grain Company still retains the proceeds of the labor and material furnished by plaintiff, which went into said plant. As this is a proceeding in equity, neither the Grain Company, nor its co-defendants, are in a position to insist that a court of equity should close its door against plaintiff, when the property of the latter is still held and claimed by the Grain Company, as the successor in title of the Elevator Company. In other words, while the Grain Company is holding the property of plaintiff, under the foregoing circumstances, and claiming to be the owner thereof, it will not be heard in a court of conscience to insist that plaintiff should not be permitted to prosecute its action, based upon a valid judgment, to recover the value of the property and labor thus furnished. [St. Louis v. Railroad, 248 Mo. l. c. 27; Platt v. Francis, 247 Mo. l.

c. 309; Roeder v. Robertson, 202 Mo. 1. c. 534-5; Henderson v. Koenig, 192 Mo. 690; City of St. Louis v. Davidson, 102 Mo. 1. c. 153-4-5.]

In view of the foregoing, respondents' contention that appellant has no legal right to prosecute this action. does not appeal to us as being sound, and is accordingly overruled.

II. Was the capital stock of the Burlington Elevator Company legally increased at the stockholders' meeting on August 28, 1907, from $150,000 to $250,000? Respondents, in their brief, assert that:

"The certificate of the Secretary of State to the effect that the capital stock of the Burlington

Increase of Stock. Elevator Company was increased from $150,- 000 to $250,000, is conclusive upon the parties to this action."

In support of this contention, we are cited to Bank v. Rockefeller, 195 Mo. 15; Boatmens' Bank v. Gillespie, 209 Mo. 217; Wells Co. v. Gastonia Co., 198 U. S. 177; Scott v. Abbott, 160 Fed. 573; Sec. 3356, R. S. 1909.

It will be observed that in each of above cases, except that of Scott v. Abbott, 160 Fed. 573, some one *other* than the State was attempting in a collateral proceeding to call in question the validity of the charter. In other words, the legality of the corporate existence was challenged in each of said cases. The principle upon which they are founded is stated by GANTT, J., in Bank v. Rockefeller, 195 Mo. 1. c. 41-2, cited by respondents, which reads as follows:

"A consideration of the sections of our statutes providing for the creation of business corporations, will show that the law has provided the steps which individuals seeking to become incorporated shall take, to-wit, the signing and acknowledging articles of association, enumerating the purposes of the corporation and requiring the filing of these articles in the office of the recorder of deeds of the county in which the corporation is to be located and filing a certified copy in the office of

the Secretary of State. These are the acts which the law requires of those who desire to become incorporated, but after all these things are done, still there is no incorporation until the State, through its Secretary of State, grants the certificate of incorporation, which takes the place of a special act of the legislature prior to our Constitution of 1875. This certificate of the Secretary of State, then, is a grant of a franchise to become a corporation, and without it there can be no corporation *de jure* under our laws. The parties to this grant are the State on the one hand and the incorporators on the other, and when once issued and accepted by the company, no one can dispute the corporate existence except the State in a direct proceeding.''

In the case at bar, the legality of the Elevator Company, as a Missouri corporation, is conceded, and its subsequent acts are attacked by plaintiff as unlawful and void, by reason of the Constitution and Statutes of this State, declaring them to be so. It is not our purpose to review the above authorities, as the ground upon which they are based is not present in the case before us.

In order to have a clear understanding of the question in issue here, we deem it necessary to set out Section 8 of Article 12 of our Constitution, which reads as follows:

''No corporation shall issue stock or bonds, except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void. The stock and bonded indebtedness of corporations shall not be increased, except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained at a meeting called for the purpose, first giving sixty days' public notice, as may be provided by law.''

Section 2981, Revised Statutes 1909, provides that:

''The stock or bonds of a corporation shall be issued only for money paid, labor done or money or

property actually received. Any corporation may increase its capital stock or its bonded indebtedness . . . but the shares of stock or bonds arising from such increase shall only be disposed of for money paid, labor done or money or property actually received. All fictitious issues or increase of stock or of bonds of any corporation shall be void: *Provided, however,* that the bonded indebtedness of a corporation shall not be increased so that the entire amount thereof shall exceed the amount of the authorized capital.''

Section 3354, Revised Statutes 1909, relating to this subject, provides as follows:

''Any corporation now existing or which may hereafter be formed for any of the purposes contemplated by this article, may increase or diminish its capital stock by complying with the provisions of this article, in any amount within the limits of this article. . . . And any corporation increasing its capital stock shall, before the same shall take effect, cause to be paid up of such increase of capital not less than fifty per cent. in lawful money of the United States.''

Section 3356, Revised Statutes 1909, relied upon by respondents, points out the necessary steps to be taken at the stockholders' meeting, to increase the capital stock of a corporation. Upon a proper statement from the chairman and secretary of the meeting, as to what was done, being verified, recorded and t certified copy of same sent to the Secretary of State, the latter shall ''issue a certificate that such corporation has complied with the law made and provided for the increase or decrease of capital stock, as the case may be, and the amount to which such capital stock is increased or decreased; and such certificate shall be taken in all courts of this State as evidence of such increase or decrease of stock . . .; *Provided,* that in cases of increase of capital stock, the statement above provided for shall set out the percentage of the increase that has been actually paid up in lawful

money of the United States, and that it is in the custody of the board of directors.''

In the case at bar, the provisions of both the Constitution and statute, in respect to foregoing matters, were utterly ignored at the stockholders' meeting on the 28th of August, 1907, when an attempt was made to increase the capital stock of the Elevator Company from $150,000 to $250,000.

The certificate furnished to the Secretary of State by Mr. H. D. Richeson, chairman of the stockholders' meeting, and A. L. Burr, secretary, among other things, contains the following:

''That the full amount of said increase of capital has been actually paid up in lawful money of the United States, and is in the hands of the board of directors of said company.'' Without undertaking to criticise the motives which actuated the making of this certificate, we find from the record that it is unqualifiedly false, in respect to said matter. Not a dollar was paid in on the alleged increase of the capital stock. The bonds issued pursuant thereto were never sold, nor legally negotiated. No stock was ever issued or distributed thereunder.

On this state of the record, it is insisted by respondents, that this court, under the authorities heretofore cited, is precluded from going behind the certificate of the Secretary of State to inquire into the *validity* of said *increase,* on the date aforesaid. If this contention be sustained, then two stockholders of a corporation, owning one share each, out of a thousand, might meet, without any notice, prepare a statement in conformity to Section 3356, supra, have it verified, recorded and delivered to the Secretary of State. Would it be contended, that the certificate of the Secretary of State, based upon a manufactured record of this character, would be conclusive against a judgment creditor proceeding in a court of equity to set aside the fraudulent and illegal acts of said wrongdoers? Again, suppose the stockholders, at the meeting held on August

28, 1907, had put up the amount necessary to cover the proposed increase of capital stock, under a secret agreement afterwards carried out, by which the amount thus deposited was to be illegally refunded, as soon as the certificate of the Secretary of State was received. Could it be said that this court would be powerless, under such circumstances, while proceeding in equity, to call in question such acts, when they are plainly declared by the Constitution and other provisions of the State, to be void?

The most casual reading of our Constitution indicates that its framers were attempting to protect the public from an attempt to increase the capital stock of a corporation, under false pretenses, where no part of the increase is paid, either by money or property. It is evident from reading Sections 2981 and 3354, Revised Statutes 1909, heretofore quoted, that the Legislature was attempting to act in harmony with the provisions of Section 8 of Article 12 of the Constitution aforesaid. If this be true, we can hardly believe that the Legislature, in the enactment of Section 3356, intended to make the certificate issued by the Secretary of State, conclusive evidence against a judgment creditor in a court of equity, while he is attempting to uncover an illegal proceeding, like the one under consideration here. But, even if the Legislature had attempted, by Section 3356, to make this certificate conclusive, it would be inoperative if in conflict with the organic law, as declared in Section 8 of Article 12 above quoted. If the certificate of the secretary of State, based upon facts unknown to him personally, precludes a judgment creditor from proceeding, in a court of equity, to uncover such frauds, then the above provision of our Constitution, in this respect, is nothing more than a mere scrap of paper. Such a construction does not protect the public or any member thereof. It opens the door to fraud, and permits corporations, by fraudulent and illegal methods, to ignore both the Constitution and provisions of the statute, in attempting

to increase their capital stock. We are, therefore, of the opinion, that the certificate of the Secretary of State referred to in Section 3356, supra, was simply intended to be prima-facie evidence of the facts stated therein, and that it was not the intention of the Legislature, in its passage, to ignore the Constitution and shut off inquiry, in respect to the validity of such illegal proceedings.

In Coleman v. Booth, 186 S. W. 1021, and following, the other division of our court had under consideration the validity of various increases of the capital stock of a corporation, in an action at law, by a trustee in bankruptcy, against the purchaser of the property, who paid for part of same out of the capital of the company. We reviewed the different alleged increases of the capital stock, and declared some of them illegal and void, and affirmed a judgment against said purchaser, on account of his dissipating a part of the capital of said corporation. If these matters could be inquired into in an action at law, surely a judgment creditor, in a court of equity, whose peculiar province it is to uncover fraud, should be permitted to show that by the unconstitutional acts of the board of directors of the Elevator Company, the entire assets of the latter, were dissipated and ultimately passed into the possession of those who participated in the unlawful dissipation of same.

A careful reading of Scott v. Abbott, 160 Fed. 573, will disclose that it is not in conflict with the conclusions heretofore reached by us. The court did go behind the certificate of increase issued by the Secretary of State, and found, as indicated on page 578, that "the shoe company received in actual money the substantial sum of about 90 cents on the dollar per share for all of its preferred stock, sold by or on its account, and this, of course, includes that sold to the appellants in this case." The court likewise called attention to Section 3354, supra, which provides that not less than fifty per cent of the increased capital stock shall be paid in lawful money of the United States before the

increase can take effect. Hence, it was held, that if 90 per cent had been paid as above indicated, it was a substantial compliance with said section. The plaintiffs in the above case, were insisting, that as the increased stock had not been subscribed or paid for at the time the statement was made for securing the increase, and never had been paid for, except as the Investment Company and others sold the same and turned over the proceeds to the shoe company, the transaction made the increase illegal. The court, however, found, in the case just cited, that the proceeding was simply an irregularity and, hence, decided adversely to the contention of plaintiffs.

In the case at bar, according to our conception of the law, the action of the stockholders on the 28th of August, 1907, in their effort to increase the capital stock of the Elevator Company, ignored both the statute and Constitution, which declared such proceedings void. It was not simply an irregularity, but the proceedings were void and open to attack collaterally or otherwise when called in question.

We may say in passing, after a careful perusal of the record in this case, that there are no rights of innocent purchasers involved, as all the parties engaged in these transactions were fully aware of all the facts which rendered the same illegal. Not a dollar was paid on the alleged increase, no stock was ever issued or delivered, no bonds were ever sold, or otherwise disposed of, except those which passed into the hands of the bank illegally, as hereafter shown.

We are, therefore, of the opinion, that the alleged increase of the capital stock of the Elevator Company, attempted to be made on the 28th of August, 1907, is in conflict with Section 8 of Article 12 of the Constitution aforesaid, as well as Sections 2981 and 3354, Revised Statutes 1909; that, by reason of the foregoing, said increase is utterly void and without effect.

III. Having reached the conclusion, in the preceding proposition, that the attempted increase of the capital stock of the Elevator Company, on August, 28, 1907, was void, it becomes necessary to determine the validity of the $100,000 of bonds authorized at the meeting of the board of directors of the Elevator Company, on October 9, 1907.

**Bond Issue.**

Prior to the 28th of August, 1907, the capital stock of the Elevator Company was $150,000, and in 1896 the Elevator Company issued $150,000 par value first mortgage bonds. On the 9th of October, 1907, when the $100,000 par-value second-mortgage bonds were directed to be issued, the property of the Elevator Company was then mortgaged for its full value. In other words, its bonded indebtedness then equaled its authorized capital. The action of the directors, on above date, in directing the issue of the $100,000 of bonds, supra, was *coram non judice* and void.

Section 2981, Revised Statutes 1909, among other things, contains the following:

"But the shares of stock or bonds arising from such increase shall only be disposed of for money paid, labor done or money or property actually received. All fictitious issues or increase of stock or of bonds of any corporation shall be void: *Provided, however,* that the bonded indebtedness of a corporation shall not be increased so that the entire amount thereof shall exceed the amount of the authorized capital."

The $100,000 of bonds provided for on October 9, 1907, are void: (1) Because the capital stock of the Elevator Company had never been legally increased and, hence, there was no basis for their issue. (2) Because the Elevator Company, at that time, was carrying a bonded indebtedness equal to its full capital, and was prohibited by Section 2981, Revised Statutes 1909, from issuing said bonds without a valid increase of its capital stock.

194    SUPREME COURT OF MISSOURI.

Hess Warm. & Vent. Co. v. Grain Elevator Co.

IV. All of the $100,000 bonds, attempted to be issued on October 9, 1907, with the exception of three, illegally found their way into the hands of the National Bank of Commerce. Before considering the question as to how the bank became possessed of these bonds, it is well to state the relation which the moving spirits in all of these enterprises bear, in reference to the bank and Elevator Company.

Knowledge of Bond Holder.

Harry D. Richeson, was the president, and A. L. Burr the secretary and treasurer, of the Elevator Company in 1907-8. J. C. Van Blarcom was the vice-president and a director of the Elevator Company during said period, and owned 600 of the 1500 shares representing the capital stock of said company. Said J. C. Van Blarcom, during the same period, was the president of the National Bank of Commerce. During the same period, George Locket Edwards was the attorney for said bank and, at the instance of Van Blarcom, prepared all the papers and dictated the proceedings, in relation to the stockholders' meeting of August 28, 1907, as well as the directors' meeting of October 9, 1907. He prepared the statement sent to the Secretary of State, representing the proceedings which occurred on the 28th of August, supra, when a resolution was passed to increase the capital stock. The statement sent to the Secretary of State was signed and sworn to by Richeson, the president, after its preparation by George Locket Edwards.

Richeson testified that he knew the proposed issue of stock was not paid up in actual cash and that he did not know his statement, sent to the Secretary of State, contained language to the contrary.

The evidence discloses than Van Blarcom was the directing spirit and dominant factor of the Elevator Company. He was likewise the active president of the Bank of Commerce, during the same period. All the proceedings in reference to the alleged attempted increase of the stock, and the issuing of the bonds, were

under the direction of Van Blarcom. So that, Van Blarcom and George Locket Edwards, during the proceedings aforesaid, were not only conducting said business ostensibly for the Elevator Company, but were likewise, at the same time, representatives of the bank. That is to say, Van Blarcom was the active president and George Locket Edwards the attorney for said bank, and were especially looking after the latter's interest while said proceedings were pending. According to the testimony, the Elevator Company had been more or less financially distressed for the past two years prior to September 6, 1908. This was known to both Van Blarcom and George Locket Edwards, as shown by the letter of the latter to B. F. Edwards, president of the Bank of Commerce, of date September 26, 1908.

After the above meeting on October 9, 1907, to-wit, on January 6, 1908, the $100,000 of bonds were delivered to the Trust Company, as trustee, for certification. They were certified February 3, 1908, and delivered to H. D. Richeson, president of the Elevator Company, on February 6, 1908, by said Trust Company. The bonds were then in the hands of the proper custodian and had neither been sold nor negotiated. They were held by the Elevator Company as a part of the alleged increase of the capital stock of said Elevator Company, in trust for its creditors and stockholders. Without any authority from the board of directors of the Elevator Company, three of these bonds were delivered, by the president of the Elevator Company, to Van Blarcom, in payment of an antecedent debt, due from the Elevator Company to him. Under the direction and order of Van Blarcom twenty-five of said bonds were delivered to the National Bank of Commerce, without any authorization from the board of directors of the Elevator Company, and turned over to said bank as collateral security for an existing indebtedness. At the request and under the direction of Van Blarcom, the remaining seventy-two bonds were taken to the National Bank of Commerce, placed in a sealed en-

velope and left with the bank as a special deposit. Without any authority from the Elevator Company or any of its officers, the Bank of Commerce, illegally and wrongfully, took possession of said seventy-two bonds and held the same with the remaining twenty-five thereafter.

After reading the record carefully, we are well satisfied from the evidence, that Van Blarcom and his associates had both actual and constructive notice, in respect to every thing which occurred, in reference to the stockholders' meeting on August 28, 1907, and in respect to the directors' meeting of October 9, 1907. Both George Locket Edwards, and Van Blarcom, represented the bank as president and counsel, during all of said proceedings. We, therefore, hold that the bank, as well as Van Blarcom, when they received the 100 void bonds, had both actual and constructive notice of the manner in which they had been issued, and of their illegality. The bank got these bonds from the Elevator Company, who held them in trust for the benefit of its creditors and stockholders. Van Blarcom, therefore, as to the three bonds, and the National Bank of Commerce, as to the ninety-seven bonds, held the same as trustees *ex maleficio* for the benefit of the Elevator Company. [Elliott v. Machine Co., 236 Mo. 546; Phillips v. Jackson, 240 Mo. 1. c. 335; Case v. Goodman, 250. Mo. 1. c. 114-5.] Even, therefore, if the bonds had been valid, the bank would not have been vested with any other title thereto, except as trustee *ex maleficio* aforesaid.

(a) Section 8 of Article 12 of the Constitution, and Section 2981, Revised Statutes 1909, heretofore set out, in express terms prohibited the issuing of bonds in payment of an antecedent debt. [Kemmerer v. St. Louis Blast Furnace Co., 212 Fed. 63; **Antecedent Debt.** Mudge v. Black, Sheridan & Wilson, 224 Fed. 1. c. 923, and cases cited; Lyon v. Bleeg, 240 Fed. 405; Coquard v. St. Louis Cotton Compress Co., 7 S. W. 1. c. 176; Garrett v. Kansas

City Coal Mining Co., 113 Mo. 330; Van Cleve v. Berkey, 143 Mo. 109; Berry v. Rood, 168 Mo. 316; Hunter v. Garanflo, 246 Mo. 131.] The bank, through its officers, had full notice of the illegality of these bonds, and knew they purported to represent the prospective increased capital stock of the Elevator Company. They were bound to know that, under the above section of the Constitution, as well as under Section 2981, Revised Statutes 1909, that money, property or its equivalent would have to be paid for the bonds. The bank, therefore, acquired no title to said bonds, whether they were valid or otherwise.

V. By reason of the foregoing, the deed of trust given by the Elevator Company on January 2, 1908, to secure said second mortgage bonds, as well as all the subsequent proceedings thereunder, are null and void as against this plaintiff. Van Blarcom and George Locket Edwards, while acting for the bank, were instrumental in having the deed of trust securing said bonds foreclosed. It was bought in by George Lane Edwards, a director of the bank, for the alleged consideration of $10,000, and conveyed, by Edwards and wife, to the defendant Grain Company, by quitclaim deed, for the expressed consideration of $5 and other alleged good and valuable considerations. All of the parties connected with said sale were acting under and through the bank, and had either actual or constructive notice of all the previous proceedings, which rendered said bonds invalid. The purchaser, at the foreclosure sale, acquired no title to the property in controversy, and conveyed none to the Grain Company.

*Deed of Trust.*

VI. It is unnecessary to extend this opinion further. In view of the well established principles of law declared by the Court in Banc, in Oldham v. Wade, 273 Mo. 231 and following, we *hold,* that plaintiff acquired a good title to the real estate in controversy, under the execution sale aforesaid.

*Conclusion.*

We further hold that the $100,000 of second mortgage bonds were never legally issued and were void, when the second deed of trust securing same was foreclosed; that all subsequent proceedings, based upon said foreclosure, are void; that the defendant Burlington Grain Elevator Company acquired no title to, nor interest in, the real estate aforesaid, by virtue of the quit-claim deed from George Lane Edwards and wife to it. *But,* as the plaintiff, proceeding according to equitable principles, in a court of chancery, has elected to accept its debt, interest and costs in both cases, if paid, and forego the title to said property, we accordingly reverse and remand the cause, with directions to the trial court to set aside its decree herein, and to enter a new decree, finding the issues involved in favor of plaintiff, and declaring the latter to be the absolute owner of the real estate in controversy. Also, reciting in the new decree that the defendant Burlington Grain Elevator Company may redeem said property, by paying to this plaintiff or its attorneys of record herein, the principal and interest due upon said judgment, and paying the costs incurred in both the former and present action, within ninety days from the date of the entering of the new decree herein. Also reciting, that within said ninety days, the plaintiff shall execute and deliver to the clerk of the circuit court in which the action is pending, a quitclaim deed to the Burlington Grain Elevator Company, conveying therein the real estate in controversy; that upon the payment of the debt, interest and costs, within the time aforesaid, the circuit clerk shall deliver to the Burlington Grain Elevator Company, or its attorneys of record herein, the quitclaim deed aforesaid. Also reciting that, if said debt, interest and costs, are not paid within the time aforesaid, the right of said Grain Elevator Company to redeem shall cease, the quitclaim deed be re-delivered to the plaintiff herein, or its attorneys of record, and that a proper writ issue, placing the plaintiff, Hess Warming & Ventilating Company, in possesion of the real estate aforesaid,

and granting any other relief which may be necessary, in carrying out the provisions of the decree, as indicated in the opinion of this court. [Woolum v. Tarpley, 196 S. W. l. c. 1129.]

*White* and *Mozley, CC.*, concur.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All of the judges concur.